MOLOKOA VILLAGE DEVELOPMENT COMPANY, LTD., Plaintiff-Appellee, *v.* KAUAI ELECTRIC COMPANY, LTD., Defendant-Appellant

NO. 6045

APRIL 2, 1979

RICHARDSON, C.J., OGATA AND MENOR, JJ., AND RETIRED JUSTICE KIDWELL ASSIGNED BY REASON OF VACANCY*

---

* Justice Kobayashi, who heard oral argument in this case, retired from the court on December 29, 1978. HRS § 602-11 (1978 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

OPINION OF THE COURT BY KIDWELL, J.

In this action a real estate developer seeks reimbursement from an electric utility company of the costs of providing underground electric and telephone systems in a subdivision. A trial by the court resulted in a judgment for the plaintiff from which the defendant appeals. Although we conclude that the claim was established for recovery of such costs as were incurred for the electric system, we remand for redetermination of the amount for which the plaintiff is entitled to reimbursement.

Appellee (Molokoa) is a corporation formed by Edward K. Jensen (Jensen) and an associate for the purpose of acquiring and developing a subdivision (Molokoa parcel) in Lihue, Kauai. Appellant (Company) is the electric utility serving the island of Kauai. Molokoa contracted and paid for an underground electric system, including a street lighting system, on the Molokoa parcel to be owned and operated by the Company, as well as an underground telephone system to be owned and operated by Hawaiian Telephone Company. Molokoa claims that the Company is obligated to reimburse to it the entire cost of these systems as the result of a conversation between Jensen and Joseph T. Orrick, the Company's president and manager. The Company acknowledges its obli-

gation to reimburse Molokoa's costs not exceeding the estimated cost of an overhead electric system in the manner and subject to the limits provided by its tariff with respect to overhead systems, but contends that payment of any more was not promised and may not lawfully be made. Three principal issues are presented: the effect of the Company's tariff, the existence of a promise by the Company to reimburse Molokoa's costs and its enforceability under the doctrine of promissory estoppel, and the correctness of the trial court's computation of Molokoa's costs. The relevant facts will be summarized in our discussion of each of these issues.

I.

The Company's tariff of rates for electrical service, as filed with and approved by the public utilities commission, contained in Rule No. 13 the provisions for determining charges made in connection with extensions of the Company's distribution lines. To provide an understanding of the Company's contention, we summarize the provisions of Rule 13 without attempting to achieve full accuracy or completeness. In sections B and C, Rule 13 provided the manner in which costs of overhead extensions were to be shared between the Company and its customers. As to overhead extensions to serve individual applicants, dealt with in section B, the Company was to install the extension (exclusive of special facilities) at its own expense if the cost of the line did not exceed the estimated 60 months revenue to be derived from the applicant. Where the estimated cost exceeded 60 months estimated revenue, the difference was required to be advanced by the applicant, subject to refund in accordance with a formula if new permanent customers or additional permanent loads were added to the line within five years. Overhead extensions to serve subdivisions and developments were governed by section C and were to be made, if prior to applications for service by the ultimate customers, only when the developer or subdivider advanced the entire estimated cost. Such advances were subject to refund when permanent customers were connected, in the amount of 60 months esti-

mated revenue from such permanent customers but only during the period of 10 years from the date of the advance.

Section D of Rule 13 governed underground extensions. The following provisions are significant to the present dispute:

1. General

The Company will install its distribution system underground only when the customer, developer or subdivider makes a contribution of the estimated difference between the cost of the underground system and an equivalent overhead system, or when for engineering and operating reasons the Company may install the system underground at its own expense. The type of underground system that will be installed under this rule shall meet engineering construction standards of the Company. In all cases, the Company will own, operate and maintain the underground facilities.

.    .    .    .

3. Extensions to and/or within Subdivisions or Developments in Advance of Applications for Service by the Ultimate User.

Underground lines will be installed by the Company in a subdivision or development prior to applications for service from the ultimate customer when the subdivider or developer makes a contribution equal to the difference between the estimated cost of the underground system and the estimated cost of an equivalent overhead system. The allowance for the overhead costs are subject to the limitations and conditions of paragraphs C of this rule. When feasible the subdivider or developer will furnish the trenching, duct work, backfill and miscellaneous construction to meet engineering construction standards of the Company.

In Molokoa's version, the promise made by Orrick to Jensen with respect to the reimbursement to Molokoa of the cost of installation of the underground system departed from

the scheme contemplated by Rule 13. Instead of providing for advances or contributions from Molokoa to defray the cost of construction of the system by the Company, the arrangement provided for the construction of the system by Molokoa with its own funds and subsequent reimbursement of some amount of the costs out of revenues derived from the system. Molokoa contends that the Company promised to reimburse 60 months revenue per lot. It is the Company's position that, even if the promise was made as Molokoa contends, it may legally reimburse Molokoa only the amount to which Molokoa would have been entitled had the construction been performed by the Company and been financed by advances from Molokoa as provided by Rule 13. We are not concerned at this point with what that amount would have been. The present question is whether Rule 13 prevents the enforcement against the Company of an otherwise enforceable undertaking to reimburse a greater portion of Molokoa's costs.

The Company's tariff had been incorporated in and approved by an order of the Public Utilities Commission (Decision and Order No. 1643), and contained the following:

> The rules and rate schedules set forth herein have been fixed by order of the Public Utilities Commission of the State of Hawaii and may not be abandoned, changed, modified or departed from without the prior approval of the Commission . . . .

> No officer, inspector, agent or employee of the Company has authority to abandon, change, modify or depart from the rules and rate schedules set forth herein or any part thereof in any respect.

The Company was a public utility, as defined in HRS § 269-1, and was subject to the provisions of HRS § 269-16, which provided that its rates and charges should be filed with the Public Utilities Commission and should not be departed from except on prior approval of the Commission. Sec. 269-16 expressly empowered the Commission to fix rates, charges and practices of any public utility and to prohibit rebates and unreasonable discrimination between users and customers. It is clear that the charges made by the Company for extensions of its lines to provide electrical service were governed

by its tariff and that the provision of service to Molokoa on more favorable terms than permitted by the tariff was unlawful. *See, South Tahoe Gas Co. v. Hofmann Land Improvement Co.*, 25 Cal. App. 3d 750, 102 Cal. Rptr. 286 (Ct. App. 1972).

It is well established that a public utility can enforce payment for its services in accordance with its established tariff, notwithstanding any agreement to charge less. Annot., Carrier's understatement of charges where discrimination is forbidden, 88 A.L.R. 2d 1375 (1963). The equitable doctrine of promissory estoppel has no application in an action by a carrier to recover the full rate after making an undercharge. *Pittsburgh, Cincinnati, Chigaco* and *St. Louis Railway Co. v. Fink*, 250 U.S. 577 (1919). The rationale for refusal to apply equitable doctrines has been explained.

> [T]he refusal to validate the economic distortion [of published rates] by such doctrines as agreement, estoppel or unclean hands is a deterrent weapon in the enforcement of the statute and the public policy which underlies it.
>
> .  .  .  .
>
> The hardship [of a shipper who has relied on a carrier's quotation of incorrect rates] has been found inadequate to alter the policy underlying the integrity of the schedule of charges. Such instances of hardship may not be permitted to destroy the more far-reaching need to maintain respect for the rates established under the Commission's procedure and on which other shippers and . . . common carriers alike must be able to rely upon as realistic facts rather than a screen which conceals illegal private practices.

*Bowser and Campbell v. Knox Glass, Inc.*, 390 F.2d 193, 196-97 (3d Cir. 1968) (footnote omitted).

The rule established with respect to common carriers applies equally to other utilities. *Shoemaker v. Mountain States Telephone and Telegraph Co.*, 559 P.2d 721 (Colo. App. 1976); *Komatz Construction Inc. v. Western Union Telegraph Co.*, 186 N.W.2d 691 (Minn. 1971); *South Tahoe Gas Co. v. Hofmann Land Improvement Co., supra.*

Molokoa argues that in *Anthony v. Hilo Electric Light Co.*, 50 Haw. 453, 442 P.2d 64 (1968), we sustained recovery by a customer from an electric utility, in violation of the utility's tariff, of reimbursement of the cost of providing an extension line, relying upon the doctrine of promissory estoppel. However, the opinion in that case makes no reference to a defense based upon the utility's tariff and it does not appear from an examination of the briefs that any tariff provision was relied upon. The question which the Company seeks to present in the present case is one of first impression.

We do not reach the question, however, unless reimbursement to Molokoa of the cost of installing the underground system, in excess of the cost of installing an overhead system, is in fact a violation of Rule 13. It is important to notice that the Company is not forbidden by its tariff from providing underground service to its customers at its own expense, without any contribution from the customer, where the installation is placed underground "for engineering and operating reasons." The parties have not directed our attention to anything in the record which bears on the question whether there may have been engineering and operating reasons for the construction of Molokoa's underground system at the Company's expense. Had such reasons existed, and had the Company's undertaking to reimburse the cost to Molokoa been predicated thereon, Rule 13 would have been no bar to payment of the reimbursement. We must consider whether the Company can claim the benefit of Rule 13 in this case without establishing that there were no engineering and operating reasons which would allow full reimbursement.

The burden of establishing that Rule 13 barred payment of Molokoa's claim was on the Company. The defense relied upon by the Company was illegality, which the Company was required by H.R.C.P. 8(c), to plead affirmatively and with respect to which the Company carried the burden of proof. *Honolulu Roofing Co. v. Felix*, 49 Haw. 578, 608, 426 P.2d 298, 318 (1967); *Inter-Continental Promotions, Inc. v. MacDonald*, 367 F.2d 293, 303 (5th Cir. 1966). No express finding of fact was made by the trial court with respect to the applicability of Rule 13. The trial court found, however, that the

design of the underground electrical system for the Molokoa area was prepared, by engineering consultants employed by the Company, as part of a design which included additional lands owned by Lihue Plantation Company, the owner of "close to" 50% of the stock of the Company. The design for the Molokoa land included an additional feeder system made necessary by the inclusion of the additional lands. Orrick informed Jensen that provision had to be made for future expansion in the underground electrical system by providing for an additional feeder system to accommodate the adjacent areas. There was no reason for Molokoa to assume the cost of the additional feeder system, which was for the benefit of both the Company and Lihue Plantation Company.

The facts found by the trial court suggest that the Company may have had engineering and operating reasons for some portion of Molokoa's underground installation and thus do not negate the existence of such reasons for assuming the entire cost of the system. In the absence of any other evidence with respect to the existence or nonexistence of such engineering and operating reasons, we conclude that the Company did not carry its burden of establishing that its undertaking to reimburse Molokoa the costs of the installation was in violation of Rule 13.

It is particularly appropriate in this case to hold the Company strictly to its burden of proof because we perceive conflicting public policies. Restatement (Second) of Contracts § 320 (Tent. Draft No. 12, 1971) states the following principle for determining when a promise is unenforceable because of public policy:

(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

The doctrine which permits a utility to enforce payment for its services in accordance with its tariff, notwithstanding that it has contracted for a lesser sum, implements a public policy against discriminatory pricing of utility services. By

imputing knowledge of the tariff to a person dealing with a utility in violation of its tariff, the courts have placed both parties in the positions of knowing violators and have deprived the utility customer of any equity which should override the public policy embodied in the tariff.

Here, however, knowledge of Rule 13 would not have made Molokoa aware that the undertaking of the Company to reimburse the costs of the underground installation was illegal, in the absence of knowledge that engineering and operational reasons did not exist for the installation of the system at the Company's own expense. Such facts were peculiarly in the knowledge of the Company and virtually inaccesible to Molokoa except to the extent that the Company disclosed them. Had both Jensen and Orrick been fully aware of Rule 13 at the time of their conversation, by inducing Jensen to rely on the promise he made on behalf of the Company Orrick would have been taking advantage of Jensen's ignorance of those facts.

The rule applicable in such a situation has been stated in Restatement (Second) of Torts § 551 (1977):

§ 551. Liability for Nondisclosure

.   .   .   .

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

.   .   .   .

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.[1]

---

[1] The comment to this clause is illuminating:

*l.* The continuing development of modern business ethics has, however, limited to some extent this privilege to take advantage of ignorance. There are situations in which the defendant not only knows that his bargaining adversary is acting under a mistake basic to the transaction, but also knows that the adversary, by reason of the relation between them, the customs of the trade or other

In *Empire West v. Southern California Gas Co.*, 12 Cal. 3d 805, 117 Cal. Rptr. 423, 528 P.2d 31 (1974), the California Supreme Court sustained the claim of a utility customer to recover for fraudulent misrepresentation of the cost of operating an installation, although it was argued that the effect was to grant preferential rate treatment. After referring to the cases which permit recovery of the published tariff rate when a utility customer has been quoted a lower rate, the court said:

> Although there is some contrary authority, . . . the better view appears to be that a carrier will be held accountable for misrepresentations regarding a fact not contained in the published tariff, and thus not subject to verification by the shipper . . . . In any event, whatever may be the rule with respect to carriers and shippers, we think that a utility customer who has been actually damaged by a utility's fraudulent misrepresentations regarding matters not contained in the published tariffs should be entitled to bring suit to recover those damages.

12 Cal. 3d 805, 810, 117 Cal. Rptr. 423, 426, 528 P.2d 31, 34 (citations and footnote omitted).

objective circumstances, is reasonably relying upon a disclosure of the unrevealed fact if it exists. In this type of case good faith and fair dealing may require a disclosure.

It is extremely difficult to be specific as to the factors that give rise to this known, and reasonable, expectation of disclosure. In general, the cases in which the rule stated in Clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to the amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware. In such a case, even in a tort action for deceit, the plaintiff is entitled to be compensated for the loss that he has sustained. Thus a seller who knows that his cattle are infected with tick fever or contagious abortion is not free to unload them on the buyer and take his money, when he knows that the buyer is unaware of the fact, could not easily discover it, would not dream of entering into the bargain if he knew and is relying upon the seller's good faith and common honesty to disclose any such fact if it is true.

There are indications, also, that with changing ethical attitudes in many fields of modern business, the concept of facts basic to the transaction may be expanding and the duty to use reasonable care to disclose the facts may be increasing somewhat. This Subsection is not intended to impede that development.

592

The line between the doctrine which permits a utility to enforce payment for its services in accordance with its tariff despite its customer's actual reliance upon a misquotation of rates and the developing standard of modern business ethics which is formulated in the Restatement may be one which moves with the development of such ethical standards. We avoid the need to resolve the question in this case. We conclude that there was a failure of proof of illegality and that the trial court correctly denied the Company's affirmative defense based upon Rule 13.

## II.

The Company attacks the trial court's findings of fact as not supported by the evidence, its conclusions of law as not supported by the findings of fact, and the ultimate conclusion that the Company is obligated under the doctrine of promissory estoppel as not supported by the findings and conclusions. In large part, the arguments with respect to the evidence are addressed to its weight and credibility. We have reviewed the alleged deficiencies in the evidence and are satisfied that, with the exception of Finding of Fact No. 30 which is dealt with in part III of this opinion and is not relevant here, all of the findings are supported by substantial evidence and are binding upon this court. Although with only a few exceptions the trial court adopted findings of fact prepared by counsel for Molokoa, the findings must stand if not clearly erroneous. Wright and Miller, Federal Practice and Procedure: Civil § 2578 (1971). The weight and credibility of the testimony was for the trial court to determine and will not be reviewed on appeal. *Shinn v. Yee, Ltd.*, 57 Haw. 215, 219, 553 P.2d 733, 737 (1976). We will confine our discussion to the asserted inadequacy of the findings and conclusions to support the judgment.

The liability sought to be enforced in this case is founded upon the doctrine of promissory estoppel. In *Anthony v. Hilo Electric Light Co.*, *supra*, we enforced a promise by an electric utility to reimburse to its customer the cost of providing an extension line, relying upon the formulation of this doc-

trine found in Restatement of Contracts § 90 (1932):

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

It is the position of the Company that the elements of promissory estoppel, as identified in this formulation, were not made out in the present case. In considering this contention, we are not confined to the trial court's express findings of fact and may also take into consideration the uncontradicted evidence contained in the record. *See, Associated Engineers and Contractors, Inc. v. State,* 58 Haw. 187, 195, 567 P.2d 397, 404 (1977). There is ample support for the invocation of promissory estoppel in this case.

When the critical conversation took place between Jensen and Orrick, Jensen possessed an unexercised option to purchase the Molokoa parcel, which had formerly been owned by Lihue Plantation Company, together with a partially completed development plan. That plan called for the installation of an underground electrical system, with capacity to provide service to adjacent lands owned by Lihue Plantation Company. Orrick, who was employed by Lihue Plantation Company as its plantation engineer, was aware of the design of this system in the development plan. Subsequent to his purchase of the option, Jensen received an estimate prepared by Lihue Plantation Company of the cost of development of the Molokoa parcel, which estimate included approximately $135,000 for the "underground power, telephone and lights." This cost had not appeared in development cost estimates supplied to Jensen prior to his purchase of the option. Jensen thereupon requested that a meeting be arranged with Orrick.

At this meeting Jensen informed Orrick that he had an option to purchase the Molokoa parcel and that he had found out that he was going to be responsibile for installing the electrical system and that the Company had some form of rebating. Jensen asked Orrick if the rebate would cover the

cost of the system.[2] Orrick told Jensen that the Company would rebate up to 60 months revenue per lot when a meter was connected to the house. In response to Jensen's question as to how much the system would cost, Orrick stated that the Company had retained a firm of engineers, Ho, Kam & Okita (Okita) to design the electrical system and that this firm should be consulted. Orrick stated in this conversation that provision had to be made for future expansion in an underground electrical system by providing for an additional feeder system to accommodate the adjacent areas.

Jensen assigned the option to an associate, who exercised the option and, pursuant to prior agreement, conveyed the parcel to Molokoa, which is owned by Jensen and the associate. The Company does not dispute that Molokoa is entitled to the benefits of the promise made by Orrick to Jensen. The underground system was constructed by Molokoa by means of several construction contracts, at a cost found by the trial court to be $256,293.84. The revenue for 60 months from the date of the issuance of the first permit for the homes involved, a period shorter than the 60 months from the date of each meter connection by which the promised reimbursement was limited, was found to be $275,929.20. Approximately one year after the construction contracts had been let, Molokoa was advised by Orrick that reimbursement of its costs would be limited in accordance with the Company's interpretation of Rule 13, set forth in part I of this opinion.

The relationship between Okita and the other parties involved in preparing the plans for the electrical system is unclear, but it appears from the findings that Okita was employed at various times by each of Lihue Plantation, the Company and Molokoa. Orrick's promise was made with reference to preliminary plans prepared by Okita. The Company reviewed the final plans at various stages in their prep-

---

[2] Orrick testified with respect to this meeting:
Q. Did he ask you any questions relating to rebates at that time?
A. Yes.
Q. Do you recall how he asked the question and what your reply, if any, was?
A. He asked, as I remember, do I get my money back? And he said, do I get all of my money back? And I said yes, in accordance with our rules.

aration and does not contend that there was any departure from the preliminary plans.

Orrick was president and manager, and a director, of the Company. One of the Company's employees testified that Orrick had control of the Company's activities. The trial court did not include in its findings of fact a determination with respect to Orrick's authority to commit the Company, but its conclusions of law include a determination that Orrick had apparent authority to bind the Company to the promise and that Molokoa was entitled to rely on such authority.

The Company's attack upon the findings of fact and conclusions of law is based in large part on their lack of specificity and comprehensiveness. In order that we may sustain the judgment our review must disclose that the elements of promissory estoppel have been found as fact by the trial court or are sufficiently clear from the record that we do not need the aid of additional findings. *Associated Engineers & Contractors, Inc. v. State*, 58 Haw. at 195, 567 P.2d at 405. The trial court did not divide the doctrine of promissory estoppel into its component elements and provide a finding of ultimate fact that precisely tracked each element. Nevertheless, the trial court's conclusions of law embody such findings of ultimate fact and the evidentiary facts from which they are drawn are expressly found.

The Company's argument proceeds upon the mistaken premise that a trial court's conclusions of law must be disregarded when not supported by express findings of fact. It is argued that his office of president and manager did not, without more, vest in Orrick either actual or apparent authority to commit the Company to make the claimed reimbursement. Since the trial court's finding of fact on this question provides us only with the office he held, the Company contends that the trial court could not conclude that Orrick had such apparent authority. This argument overemphasizes the label which the trial court put on its determinations.

H.R.C.P. 52 requires that findings of fact not be set aside unless clearly erroneous. It is a familiar principle that conclusions of law are not binding on an appellate court. A conclu-

sion of law is not rendered immune from review because labelled a finding of fact. 9 Wright & Miller, Federal Practice and Procedure: Civil § 2588 (1971). The converse is also true, and a finding of fact is not freely reviewable by reason of its label as a conclusion of law. Although labelled a conclusion of law, the determination of the trial court that Orrick acted within the scope of his apparent authority is binding upon us as a finding of fact. A conclusion of law was treated similarly as a finding of fact in *Gilmore v. Constitution Life Insurance Co.*, 502 F.2d 1344 (10th Cir. 1974), in which the company was held liable for the fraud of its agent committed while acting within the scope of his apparent authority. The trial court failed to make a finding of fact on the question of the agent's apparent authority, but expressed that determination only in its conclusions of law. It was held that this was a finding of ultimate fact which was binding upon the appellate court unless clearly erroneous. Also see *Famous Knitwear Corporation v. Drug Fair, Inc.*, 493 F.2d 251 (4th Cir. 1974); *Bogue Electric Manufacturing Co. v. Coconut Grove Bank*, 269 F.2d 1 (5th Cir. 1959).

The trial court's conclusion of law, by which it determined that Molokoa had met its burden of establishing the elements of liability under the doctrine of promissory estoppel, is entitled to the same deference. These elements, as stated by the trial court, were (1) a promise, (2) intended to be relied upon, (3) which was relied upon, (4) under circumstances in which the refusal to enforce it "would be virtually to sanction the perpetration of fraud or result in other injustice." The trial court's determination, although labelled a conclusion of law, constitutes a finding of the ultimate fact that each of the four factual elements of promissory estoppel was established. We note that the trial court stated the second element somewhat more strictly than is done in Restatement of Contracts § 90, which we applied in *Anthony v. Hilo Electric Light Co.*, *supra*, and which substitutes reasonable expectation of action or forbearance induced by the promise in lieu of intent to induce such action or forbearance. This strictness, if excessive, of course does not impair the sufficiency of the finding to support the judgment.

Our review of the trial court's detailed findings and the uncontroverted evidence in the record leaves us in no doubt that these findings of ultimate fact are amply supported by the record. (1) Orrick's own testimony established a promise of reimbursement of all of Molokoa's costs of installing the electrical system "in accordance with our rules." It was found as a fact that the promised reimbursement was limited by Orrick to a sum which did not exceed the revenue from each lot for the period of 60 months from the date of each meter connection. We have determined that the Company's rules did not prevent reimbursement in that amount and the amount of the costs which the trial court found to be reimbursable did not exceed the stated limitation as determined by the trial court. (2) The circumstances under which the conversation between Jensen and Orrick took place provide a strong inference, amply sufficient to support the trial court's finding, that the promise was intended to induce Jensen to acquire the land and proceed with the development, which would provide a substantial increase in the number of revenue producing homes to which the Company's system was connected. (3) Reliance upon the promise is to be tested under the standard we applied in *Anthony v. Hilo Electric Light Company, supra*. There we found it sufficient that the utility company's customer made the contemplated investment after being assured of reimbursement. The same standard of proof of reliance is exemplified by the illustrations appended to Restatement of Contracts § 90. We think no higher standard of proof should be applied in this case. (4) The criterion of avoidance of fraud or other injustice is also satisfied under the *Anthony* standard. In that case the injustice consisted in the retention by the utility company of a payment from a third party which would not have been made had the customer not made the outlay of funds induced by the promise. Here the Company has been provided with the extension of its system, and the consequent revenue, which the promise was intended to induce Molokoa to provide.

We conclude, therefore, that Molokoa established its claim for reimbursement in the amount of its costs of con-

structing the underground electrical system to which the Orrick promise had reference. The Company's final contention is that these costs were determined and awarded by the trial court in an excessive amount.

III.

Judgment was entered in favor of Molokoa in the principal amount of $256,293.84. The manner in which the trial court arrived at this amount is disclosed in Finding of Fact No. 30:

The plaintiff from the evidence submitted (PX-113, 121A) which was not rebutted did expend and obligated itself to the following sums:

Nii's Electric Shop, Inc. ............ $152,795.52
Hercules Construction Co., Inc. ..... 26,379.00
Ho, Kam & Okita, Inc. ............ 11,026.38

There was no payment made by Plaintiff for the cable splicing since it would be an amount to be deducted from the amounts that would be paid by Kauai Electric which totaled $5,000.00. The matter of what the general overhead costs for the development of the subdivision based on ratio of the electrical costs as against the total project costs as set forth in Note 1 of Exhibit 121A (9.15% factor) provides for a $36,812.80 general overhead allocable to the electrical system. Okita testified that a contractor's estimated profit factor is 25% on the neighbor islands and profit factors range from 33% to 40% (Tr. 163) and therefore the 15% profit set forth in Exhibit 121A of $29,280.14 is reasonable. The foregoing totals to $256,293.84. The Court notes that the total cost of the subdivision has been documented to $2,133,209.61 and was not rebutted as is shown in Exhibit 124.

The Company contends that the costs so found by the trial court included the following items of cost for which reimbursement had not been promised: cost of underground telephone system, $45,983.57; cost of alleged unnecessary extra capacity cables and switching vault installed as part of the underground electrical system, $49,918.81; Molokoa's overhead, $36,812.80; Molokoa's profit, $29,280.14. We have ex-

amined the portions of the record to which the trial court referred in its Finding of Fact No. 30, and also portions of the record referred to by the Company in support of the foregoing itemization of allegedly excessive costs. We are left with no doubt that the trial court, in computing the amount for which judgment was rendered, included substantial amounts of Molokoa's cost of construction of facilities for which reimbursement had not been promised.

The trial court's findings of fact establish a promise by the Company to reimburse to Molokoa the latter's cost of providing the underground electrical system which was constructed, including those portions of the system which provided extra capacity to enable service to be extended to adjoining lands. The promise, as so found by the trial court, did not extend to the costs of constructing the underground telephone system which Molokoa also provided. We have not been referred to any part of the record in which these systems are described in detail. It is manifest from the terms of construction contracts entered into by Molokoa, contained in the record, that the costs set forth in Finding of Fact No. 30 included costs of the construction of both systems. Molokoa's exhibit 121A, to which the trial court referred in Finding of Fact No. 30, provides the cost itemization which the trial court incorporated in its finding. Although the statement is entitled "Cost of Underground Electrical Unit", Molokoa's counsel conceded at the time of its introduction that costs of the telephone system were included.[3] Since the trial court's findings with respect to the promise of reimbursement made

---

[3] The following colloquy occurred:

THE COURT: What about the objection with reference to the breakdown between the electrical, telephone and street lighting? Is that included in those figures or is that excluded from those figures?

MR. SAKAI: (After conferring with Mr. Jensen) I am informed by my client that everything is included except the $1,044.00 of the telephone company. And one of the theories upon which, your Honor, we are proceeding is that we're entitled to recovery of the entire system without the necessity of allocation. In other words, the representations which were made to Mr. Jensen were that he was going to recover for the entire system. And; of course, we also have in evidence, your Honor, an allocation of breakdown also. In other words, the

by the Company provided no justification for the inclusion of the costs of the telephone system, Finding of Fact No. 30 is clearly erroneous and does not sustain the computation of costs reflected in the judgment. The judgment must be vacated and the case must be remanded for redetermination of Molokoa's costs of providing the underground electrical system.

In the redetermination of costs on remand, the overhead and profit items included in the computation in Finding of Fact No. 30 will require reconsideration. These amounts will change, in any event, with any recomputation of the costs upon which they are based. We express no opinion whether, under all the facts of this case, Molokoa's costs of providing the underground electrical system included overhead or profit, or whether the manner of computing these amounts adopted in Finding of Fact No. 30 was appropriate.

The judgment is vacated and the case is remanded for further proceedings consistent with this opinion.

*Felix A. Maciszewski* for defendant-appellant.

*Hiroshi Sakai* for plaintiff-appellee.

---

Court, after weighing or judging all the evidence, is going to have to determine which one of these various alternatives the Court is going to arrive upon, and so this is all that we're doing.