Electronically Filed
Supreme Court
SCWC-17-0000656
13-DEC-2019
09:13 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee,

vs.

RODNEY ROBERT RODRIGUES, JR.,
Petitioner/Defendant-Appellant.

SCWC-17-0000656

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000656; 3CPC171000034)

DECEMBER 13, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

Our caselaw has established that a search warrant for a multiple-occupancy building must describe with particularity each unit to be searched so as to preclude the indiscriminate search of one or more subunits. The defendant in this case moved to suppress evidence gathered from a search of his

residence asserting that the search warrant did not state with specificity the subunit he resided in.

The circuit court determined that the searched building was a multiple-occupancy building and that the affiant officer knew or should have known that the defendant's subunit was a separate unit. The search warrant did not describe the defendant's subunit with particularity, the court concluded, and thus the search violated the defendant's constitutional rights. The court granted the defendant's motion to suppress in an order that included detailed findings of facts and conclusions of law.

The State appealed the order. The Intermediate Court of Appeals (ICA) disagreed with the circuit court's finding that the building was a multiple-occupancy building and held that the court erred in granting the defendant's motion to suppress.

Based upon our precedent as to findings of facts unchallenged on appeal and our law involving multiple-occupancy buildings, we conclude that the ICA erred and accordingly vacate the ICA's Judgment on Appeal and remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND AND PROCEDURAL HISTORY

Rodney R. Rodrigues, Jr., was arrested as a result of a May 18, 2017 search of his residence on the island of Hawaiʻi that uncovered various drugs and drug paraphernalia. Rodrigues was subsequently charged by complaint in the Circuit Court of

the Third Circuit (circuit court) with two counts of Promoting a

Dangerous Drug in the First Degree in violation of Hawai'i

Revised Statutes (HRS) § 712-1241(1)(a),[1] three counts of

Promoting a Dangerous Drug in the Third Degree in violation of

HRS § 712-1243(1),[2] two counts of Promoting a Harmful Drug in the

Fourth Degree in violation of HRS § 712-1246.5(1),[3] one count of

Promoting a Detrimental Drug in the Second Degree in violation

of HRS § 712-1248(1),[4] and one count of Prohibited Acts Relating

---

[1]     HRS § 712-1241(1)(a) (2014 & Supp. 2016) provides as follows:

(1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:

(a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:

(i) One ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers; or

(ii) One and one-half ounce or more, containing one or more of any of the other dangerous drugs[.]

[2]     HRS § 712-1243(1) (2014) provides that, "A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount."

[3]     HRS § 712-1246.5(1) (2014) provides that, "A person commits the offense of promoting a harmful drug in the fourth degree if the person knowingly possesses any harmful drug in any amount."

[4]     HRS § 712-1248 (2014) provides the following in relevant part:

(1) A person commits the offense of promoting a detrimental drug in the second degree if the person knowingly:

(a) Possesses fifty or more capsules or tablets containing one or more of the Schedule V substances;

(continued . . .)

3

to Drug Paraphernalia in violation of HRS § 329-43.5(a).[5]

### A. The Investigation and Warrant

On May 11, 2017, Officer Marco Segobia of the Hawaiʻi Police Department submitted an Affidavit for Search Warrant (Affidavit) to the District Court of the Third Circuit (district court). The Affidavit included the following statements. Officer Segobia received information from a confidential informant (CI) who claimed to have observed Rodrigues sell methamphetamine multiple times in exchange for U.S. currency. At the direction of Officer Segobia, the CI conducted a controlled purchase of methamphetamine from Rodrigues' residence

---

(. . . continued)

> (b) Possesses one or more preparations, compounds, mixtures, or substances, of an aggregate weight of one-eighth ounce or more, containing one or more of the Schedule V substances;
>
> (c) Possesses one or more preparations, compounds, mixtures, or substances, of an aggregate weight of one ounce or more, containing any marijuana; or
>
> (d) Distributes any marijuana or any Schedule V substance in any amount.

[5]     HRS § 329-43.5(a) (2010 & Supp. 2016) provides the following:

> Except as provided in subsection (e), it is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. A violation of this subsection shall constitute a violation subject to a fine of no more than $500.

4

located at the North West corner of the intersection of Konalani Street and Puuhalo Street. The residence was a two story light colored wood siding structure with a white colored rooftop. Officer Segobia maintained constant surveillance as the CI walked to, entered, and exited the residence. The CI turned over a zip packet, containing an unspecified amount of clear crystal substance that obtained a presumptive positive result for methamphetamine after Officer Segobia tested it.

The Affidavit requested to search the following location:

> A residence located within the County and State of Hawai'i and within the District of Kona. Your affiant describes the residence as a three bedroom, 2 bathroom residence that [is] light colored, [and] has a white colored rooftop. The residence is located at [] Puuhalo Street in Kailua-Kona, Hawai'i. Your affiant checked the Hawai'i County Property Tax website and located the residence, which is owned by Yolanda M. RODRIGUES of address [] Puuhalo Street, Kailua-Kona, Hawai'i 96740. . . . To include but not limited to all rooms, and other parts therein, the patio or lanai of such unit, and any attached garages and carport, attached storage rooms, garbage cans and containers located within[.]

The district court issued a search warrant authorizing the search of the residence and property as described in the Affidavit. The warrant authorized the search for methamphetamine, drug related paraphernalia, articles tending to show the sale, proceeds of sale, or transport of methamphetamine, articles tending to establish who controlled

5

the premise, and U.S. currency with or near a controlled substance.[6]

### B. Circuit Court Proceedings

Rodrigues filed a Motion to Suppress Evidence and for Return of Property (Motion) in which he requested the suppression of "all evidence obtained as a result of the search of the ohana studio dwelling unit, in violation of [his] constitutional rights under Article I" of the Hawaiʻi Constitution.

In his Motion, Rodrigues argued that the warrant defined the main residence with particularity, but failed to mention the separate and distinct ʻohana unit that the police actually searched.[7]  Thus, there was no probable cause to search his ʻohana dwelling unit, Rodrigues contended, because a search warrant for a "multiple-occupancy building" must describe with particularity the specific subunit to be searched to be valid. Alternatively, Rodrigues maintained that if the warrant did authorize a search of his subunit, it was overbroad.  Rodrigues

---

[6]     The inventory filed with the district court after the search indicated that the officers seized, <u>inter alia</u>, 131.4 grams of crystal methamphetamine, 93.4 grams of cocaine, 33.4 grams of marijuana, various pills and drug paraphernalia, three vehicles, and $993 in cash.

[7]     "'Ohana dwelling' means a second dwelling unit permitted to be built as a separate or an attached unit on a building site, but does not include a guest house or a farm dwelling."  Hawaiʻi County Code 1983, ch. 25, § 25-1-5(b) (republished 2005).

also sought the return of his seized vehicles and cash under Hawai'i Rules of Penal Procedure (HRPP) Rule 41(e).[8]

In opposition, the State argued that the warrant satisfied the particularity requirement and that the search did not exceed the scope of the warrant. The State acknowledged the general rule that a warrant for a multiple-occupancy building will usually be held invalid if it fails to describe the particular subunit. However, the State maintained that there is an exception when (1) the building appears to be a single-occupancy building and (2) the affiant, investigating officers, and executing officers neither knew nor had reason to know that it was a multiple-occupancy building until the execution of the warrant was ongoing. Based on the information available to Officer Segobia at the time that the warrant was issued, the scope of the search warrant did not preclude him from searching Rodrigues' residence, the State argued, because it appeared that all occupants had access to the entirety of the building, making it a single-occupancy residence.

---

[8] HRPP Rule 41 (2013) provides in pertinent part:

(e) Motion to return property. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move the court having jurisdiction to try the offense for the return of the property. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be returned unless otherwise subject to lawful detention, but the judge may impose reasonable conditions to protect access to the property and its use in later proceedings.

Next, the State argued that the execution of the search warrant was valid and did not exceed the scope of the warrant. The State asserted it was reasonable to search the entire dwelling described in the warrant because the search was conducted prior to discovery of the fact that Rodrigues' unit was a separate unit. Thus, according to the State, the search was valid as there was not objectively verifiable evidence from which the police officers should have unequivocally recognized that Rodrigues' unit required a separate warrant.

At the hearing on the Motion, Rodrigues called two witnesses.[9] Rodrigues first called Officer Segobia who testified that his Affidavit was based on information that he obtained from the CI and from observing the controlled purchase. The main entrance of the residence was through the carport at the top portion of the residence, Officer Segobia testified, but he saw the CI walk downstairs and go to the downstairs unit, not the main entrance he described in the search warrant. The officer explained that Rodrigues was living in a downstairs unit of the residence located on the south portion of the lot.

The "upstairs unit is completely separate from the downstairs unit" such that a person cannot access the downstairs unit from the upstairs portion of the residence, the officer

_____

[9] The Honorable Henry Nakamoto presided.

explained.  Although Officer Segobia stated that the CI "wasn't 100 percent if there would be a stairwell within [Rodrigues'] unit or not" after conducting the controlled purchase, Officer Segobia acknowledged that, when he executed the warrant, there was no stairway connecting the downstairs unit to the upstairs portion of the residence.  Officer Segobia further acknowledged that the unit he described in his Affidavit was "not the unit [he] searched."

Officer Segobia stated that he described the property as one residence in his Affidavit because the Hawai'i real property tax map described the residence as being a three bedroom owned by Yolanda Rodrigues (Ms. Rodrigues), who is Rodrigues' mother.  Based on this information, the officer said, he concluded that the downstairs unit was not an 'ohana unit but rather a bedroom that is located downstairs of the residence that "almost looks like [] an extension" of the residence.

Officer Segobia also testified that his "personal friend" and Rodrigues' brother-in-law, Nick Ah Nee, was the resident of the downstairs unit prior to Rodrigues, and that he spoke with Ah Nee about the unit before the warrant was executed.  Ah Nee said that he lived in the downstairs unit with his wife prior to Rodrigues, Officer Segobia explained.  The officer testified that Ah Nee also said that Rodrigues lived

upstairs in an office unit until Ah Nee moved out, at which point Rodrigues moved into the downstairs unit and the upstairs portion became Ms. Rodrigues' "portion of the residence." Officer Segobia stated that he had previously visited Ah Nee at the residence while Ah Nee was living there.

As to his Affidavit, Officer Segobia testified that he described the entire residence and the front of the residence because "the information [from the CI] was very vague" as to whether the upstairs was accessible from Rodrigues' unit. He also described the residence as a whole, he explained, because it is owned by the same person. Officer Segobia elaborated that the CI could not give him information as to the inside of the downstairs unit layout. The officer added that he "didn't want to get too specific in [his] affidavit since the CI could not confirm the information." While acknowledging that the description of the area that he wanted to search was nowhere in his Affidavit, the officer nonetheless testified that the search warrant was intended to cover the upstairs portion of the house and the downstairs portion of the house. Officer Segobia stated that he described the residence in his Affidavit as "wood siding with a white color roof," but when questioned, he acknowledged that the downstairs unit was "painted sort of a greenish color" and did not have wood siding on it.

As to the execution of the warrant, Officer Segobia testified that he approached the downstairs door located on the south side of the residence because that door is where he saw the CI do a transaction with Rodrigues. But the officer stated he believed, based on the information he obtained from Ah Nee that Rodrigues also lived in the residence while Ah Nee lived there, that "everybody would have access to everything" inside the residence. When he discovered the upstairs portion of the residence was not accessible from the downstairs unit, Officer Segobia testified, he called the search off in the top portion of the residence. Officer Segobia further acknowledged that the unit he described in his Affidavit was not the unit he searched.

After Officer Segobia's testimony concluded, Rodrigues called Ms. Rodrigues to testify. Ms. Rodrigues stated that she owned a home located at "[] Puuhalo Street," which had three bedrooms upstairs and "a separate unit" downstairs. Rodrigues began living in the downstairs unit, and paying rent, about two years prior to May 2017, Ms. Rodrigues testified. She explained that the downstairs unit had a kitchen, bathroom, and its own lock.[10]

---

[10]     Ms. Rodrigues testified that she possessed the keys to both the downstairs unit and the upstairs portion of the residence at the time of the search.

11

The circuit court issued Findings of Fact (FOF) and Conclusions of Law (COL); Order. The court determined that Officer Segobia's Affidavit did not mention the separate downstairs residential unit nor did it mention an entrance on the lower story and Konalani Street side of the residence. Additionally, in FOF 9, the court found that:

> 9. Officer Segobia testified the downstairs unit is separate from the upstairs unit with its own bedroom, bathroom and kitchen.

The court explained that Officer Segobia "admitted he did not describe the downstairs unit and side doorway in his application for [the] search warrant" but nonetheless "searched the downstairs unit which is completely separate from the upstairs unit described in the search warrant." The court also found that the officer testified that he did not search the three bedroom, two bathroom residence with light colored siding and white rooftop. Finally, the court determined that Officer Segobia testified that he had been aware at one time that the house had been inhabited by multiple individuals and that he was personally acquainted with the previous resident and had visited the house.

The circuit court concluded that the search warrant in this case described with particularity the upstairs residence as it identified how one must travel to the upstairs residence, what the upstairs residence looks like from the outside, as well

as the number of bedrooms and bathrooms in the upstairs unit. But the warrant did not describe at all the separate studio unit located downstairs, the court explained. Accordingly, the court stated that "[n]othing in the Affidavit describes the studio unit on the bottom floor despite Officer Segobia having ample facts about this downstairs unit, its separate entrance and identifying characteristics." Thus, the court concluded that the Affidavit and the search warrant did not describe and therefore did not authorize the search of the separate downstairs studio unit.

The court also determined that the Affidavit set forth facts sufficient to issue a warrant for the upstairs unit and to justify a search of that unit, only. However, in COL 11 the court concluded that:

> 11.  The Affidavit and the search warrant simply do not describe and therefore do not authorize the search of the separate downstairs studio unit.

The court emphasized that the Affidavit did not set forth any facts sufficient to justify a warrant for a search of the separate studio unit. The court additionally found that "Officer Segobia knew or should have known that the residence was a multi-unit dwelling with more than one occupant" because he "knew the previous resident, and had been to the residence." Further, the "outward appearance of the residence" itself suggested that "the downstairs [was] a separate unit" because it

13

had a separate entrance, the court determined.  The warrant was therefore invalid, the court ruled, because it failed to describe with particularity the place to be searched.

As to the search itself, the circuit court concluded that the warrant did not authorize the search of the separate downstairs studio unit, and therefore the search exceeded the scope of the warrant.  And the search of the property outside the scope of the warrant was invalid in its own right because there was no probable cause to justify a search of the downstairs studio unit and Rodrigues had a reasonable expectation of privacy in the downstairs studio unit, the court ruled.  As a result, the court granted Rodrigues' Motion and ordered the return of his three vehicles and cash.  The State filed a timely appeal.

## II. ICA PROCEEDINGS

In a Memorandum Opinion, the ICA stated that the State's appeal turned on the application of rules governing "multiple occupancy" search warrants because the circuit court based its decision, in major part, on its implicit factual determination that the residence subject to the search at issue was a multiple-occupancy dwelling.[11]

---

[11]     The ICA's memorandum opinion can be found at State v. Rodrigues, No. CAAP-17-0000656, 2019 WL 1123752 (App. Mar. 12, 2019).

14

The ICA found that the residence in this case was not a multiple-occupancy building because (1) the evidence did not demonstrate that Rodrigues maintained exclusive access to the lower unit, and (2) the structure had the outward appearance of community occupation. On the second point, the ICA elaborated that the residence had one address, one mailbox, and no additional doorbell for the lower unit.[12] The ICA also explained that the property tax records did not indicate there was an additional kitchen, bath or bedroom in the lower unit, nor did the records indicate that this was a separate dwelling unit. Thus, the ICA concluded that the circuit court's "implicit finding" that the structure was a multiple-occupancy building was clearly erroneous based on the information Officer Segobia had at the time that he applied for a search warrant.

The ICA also found that the failure of Officer Segobia to more specifically describe the internal structure of the residence did not render the warrant invalid. The ICA acknowledged that the officer had been inside the lower unit at one time, but stated that his knowledge of its particulars was not extensive and he thought, although he was not sure, that there was an internal staircase. Additionally, the ICA

---

[12]    It is unclear what evidence the ICA relied on to determine whether a doorbell existed as there was no mention of the word "doorbell" at the hearing, and there is nothing in the record discussing one.

explained that the CI could not give more specifics regarding the internal structure nor could he confirm whether an internal staircase existed at the time. The warrant authorized the search of the entire structure, the ICA determined, because Officer Segobia had information that all of the family members had access to the entire house.[13] The ICA therefore concluded that the circuit court erred in concluding that the warrant was not sufficiently specific, and it vacated the circuit court's Findings of Fact and Conclusions of Law.

Judge Leonard dissented from the ICA's decision, noting that the State only challenged COL 9 and 11 and did not contest any of the other findings of facts, conclusions of law, or mixed findings and conclusions.[14] These unchallenged mixed findings were well-grounded in the testimony and evidence in the record and reasonable inferences therefrom, the dissent stated.

---

[13] Although Officer Segobia stated that "it appeared that everybody would have access to other people's areas" in the residence, he did not testify that Ah Nee told him this information. Rather, despite his knowledge that Ah Nee previously occupied the downstairs unit, the officer's supposition was based on the fact that "this [was] a family house." Additionally, Officer Segobia's Affidavit did not indicate his belief that "everybody would have access to other people's areas."

[14] As stated, the challenged conclusions of law were as follows:

> 9. Officer Segobia testified the downstairs unit is separate from the upstairs unit with its own bedroom, bathroom and kitchen.

> 11. The Affidavit and the search warrant simply do not describe and therefore do not authorize the search of the separate downstairs studio unit.

The unchallenged findings of fact demonstrated that the downstairs unit was separate and distinct from the upstairs unit, and that Officer Segobia knew this from personal experience and observations, the dissent noted. The dissent explained that the unchallenged conclusions and findings also found that Officer Segobia failed to describe the bottom unit in his Affidavit and thus failed to justify a warrant or search of that unit. Thus, the State's contention that COL 9 was clearly erroneous was without merit and the State's challenge to COL 11 was inconsistent with the Circuit Court's unchallenged findings and the record on appeal, the dissent concluded.

The case was remanded to the circuit court for further proceedings. Rodrigues timely filed an application for writ of certiorari, which this court accepted.

### III. STANDARDS OF REVIEW

We review a circuit court's findings of fact under a "clearly erroneous standard," and we review its conclusions of law de novo. Mikelson v. United Servs. Auto. Ass'n, 107 Hawai'i 192, 197, 111 P.3d 601, 606 (2005) (quoting RGIS Inventory Specialist v. Hawai'i Civil Rights Comm'n, 104 Hawai'i 158, 160, 86 P.3d 449, 451 (2004)). Additionally, a conclusion of law "that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is

17

dependent upon the facts and circumstances of the particular case." Booth v. Booth, 90 Hawaiʻi 413, 416, 978 P.2d 851, 854 (1999) (quoting Poe v. Hawaiʻi Labor Relations Bd., 87 Hawaiʻi 191, 195, 953 P.2d 569, 573 (1998)). But while "[c]onclusions of law are not binding upon an appellate court and are freely reviewable for their correctness," LC v. MG & Child Support Enforcement Agency, 143 Hawaiʻi 302, 310, 430 P.3d 400, 408 (2018) (internal quotation marks omitted), unchallenged findings of fact are "binding upon this court." Kelly v. 1250 Oceanside Partners, 111 Hawaiʻi 205, 227, 140 P.3d 985, 1007 (2006).

## IV. DISCUSSION

### A. The Warrant Was Invalid Because It Did Not Particularly Describe Rodrigues' Unit

The Hawaiʻi Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause . . . and particularly describing the place to be searched[.]"[15] Haw. Const. art. I, § 7. The particularity requirement ensures that a search pursuant to a warrant "limit[s] the police as to where they can search, for otherwise the constitutional protection against warrantless searches is

---

[15] This language is identical to the language of the Fourth Amendment to the United States Constitution. See U.S. Const. amend. IV.

meaningless." State v. Anderson, 84 Hawai'i 462, 467, 935 P.2d 1007, 1012 (1997) (quoting State v. Woolsey, 71 Haw. 638, 640, 802 P.2d 478, 479 (1990)). A determination regarding whether a warrant satisfies the particularity requirement must be made "on a case-by-case basis, taking into account all of the surrounding facts and circumstances." Id. at 468, 935 P.2d at 1013 (quoting State v. Kealoha, 62 Haw. 166, 170-71, 613 P.2d 645, 648 (1980)). While "[t]he cornerstone of such a determination is the language of the warrant itself," the "executing officer's prior knowledge as to the place intended to be searched, and the description of the place to be searched appearing in the probable cause affidavit in support of the search warrant" is also relevant. Id. (quoting State v. Matsunaga, 82 Hawai'i 162, 167, 920 P.2d 376, 381 (App. 1996)).

A search warrant that authorizes the search of a "multiple-occupancy [dwelling] . . . will usually be held invalid if it fails to describe the particular subunit to be searched with sufficient definiteness to preclude a search of one or more subunits indiscriminately." Id. (quoting 2 Wayne R. LaFave, Search and Seizure § 4.5(b), at 526–29 (3d ed. 1996)). That is, the particularity requirement "is not met when only a general description of a multiple-occupancy building is provided[.]" 68 Am. Jur. 2d Searches & Seizures § 224, 407

(2010). This is because the "basic requirement" of the Fourth Amendment and article I, section 7 "is that the officers who are commanded to search be able from the 'particular' description of the search warrant to identify the specific place for which there is probable cause to believe that a crime is being committed." 2 Wayne R. Lafave et al., Criminal Procedure § 3.4(e), at 186 (4th ed. 2015). A search warrant, however, is not defective for failing to specify a subunit within the designated building if the building "from its outward appearance would be taken to be a single-occupancy structure and neither the affiant nor other investigating officers nor the executing officers knew or had reason to know of the structure's actual multiple-occupancy character until execution of the warrant was under way." Anderson, 84 Hawai'i at 468, 935 P.2d at 1013 (quoting 2 LaFave, supra, § 4.5(b), at 526-29).

Thus, whether the warrant in this case satisfied the particularity requirement entails a determination of (1) whether the structure would be viewed as a multiple-occupancy structure from its outward appearance, and (2) whether the affiant or other investigating or executing officers knew or had reason to know of the structure's actual multiple-occupancy character prior to the commencement of execution of the warrant. See id.

If either of these questions yields an affirmative answer, then the search warrant is invalid.

Here, the downstairs unit had a different appearance than the remainder of the residence. The downstairs unit was painted green whereas the rest of the residence was light colored, and unlike the upstairs portion of the residence, the downstairs unit did not have wood siding. Additionally, the downstairs unit's roof was not connected to the roof covering the rest of the residence. The downstairs unit also had an entrance that was separate from the upstairs portion and accessible from a separate street. A worn path led from the entrance of the upstairs residence to the entrance of the downstairs unit. Indeed, the CI that conducted the controlled purchase walked along the path and entered the downstairs unit through this separate entrance. And Officer Segobia testified that the downstairs unit's entrance was not the same as the main door that he had described in the search warrant.[16] These facts signaled that the downstairs unit was not internally connected to the rest of the residence.

---

[16] One factor relevant to whether a unit appears to be a residence is whether the unit has "its own access to the outside." Anderson, 84 Hawaiʻi at 471, 935 P.2d at 1016; see also United States v. Kyles, 40 F.3d 519, 524 (2d Cir. 1994) (explaining that a "[f]actor[] that indicate[s] a separate residence include[s] separate access from the outside" (citing United States v. Ayers, 924 F.2d 1468, 1480 (9th Cir. 1991); United States v. Hinds, 856 F.2d 438, 441-42 (1st Cir. 1988))).

The circuit court specifically determined that the residence's outward appearance indicated the downstairs was a separate unit.  The court's related findings of fact are in accord with this determination.  It found that the downstairs unit has its own door to the outside and the door has a lock.  The court also found that the downstairs unit had a different appearance than the upstairs portion of the house as the outside of the house was green on the bottom and brown on the top and the top portion has new lumber and has a different color from the downstairs.  Thus, the court determined that Officer Segobia had ample facts about the downstairs unit, its separate entrance and identifying characteristics.  None of these findings of fact were challenged by the State on appeal.[17]  These findings, and the underlying evidence, support the circuit court's unchallenged determination that the outward appearance of the residence suggests that the downstairs is a separate unit.  Thus, the evidence supports the circuit court's finding that the outward appearance of the residence indicated that the structure

---

[17]     Despite the unchallenged findings of the circuit court, the ICA found the residence had the appearance of "community occupation" because there was only one address and one mailbox and because the property tax records did not show a separate dwelling unit.  While a single address and mailbox can be considered in determining the "outward appearance" of a structure, see Anderson, 84 Hawaiʻi at 471, 935 P.2d at 1016, tax records do not aid in determining the "outward appearance" of a structure.  The more weighty countervailing circumstances that the circuit court considered included the different physical appearance and construction materials of the two residential units, the units' different roofs, and the separate entrances of the units that were on different streets.

described in the search warrant would not be taken as a single-occupancy structure, and on this basis alone, the warrant was not valid.

Turning to the second question, the search warrant authorized a search of "a three bedroom, 2 bathroom residence . . . located at [] Puuhalo Street[.]"  The evidence shows that Officer Segobia had significant knowledge of the details of the downstairs prior to the execution of the search warrant.  In addition to the outward appearance of the structure, the officer's knowledge that Ah Nee and his wife previously lived in the unit apart from Rodrigues indicated that multiple families had been separately living in the building.  Officer Segobia acknowledged being told by Ah Nee that during the time he lived in the unit with his wife, Rodrigues lived "upstairs in an office unit."  The officer also knew that when Ah Nee moved out, Rodrigues moved into the downstairs unit and the upstairs portion became his mother's portion of the residence.  And, Officer Segobia had been inside the downstairs unit while Ah Nee lived there.  Further, Officer Segobia had personal knowledge of the appearance of the building because he was both the investigating officer who drafted the Affidavit and the officer that executed the search warrant.

The circuit court's findings of fact support its conclusion that Officer Segobia "knew or should have known" that

the residence he described in his Affidavit, and that was described in the search warrant, "was a multi-unit dwelling with more than one occupant." The court found that Officer Segobia testified that Rodrigues was living in a downstairs unit of the residence located on the south portion of the residence. Additionally, the court found that the officer had been aware at one time that the house had been inhabited by multiple individuals and that Officer Segobia was personally acquainted with the previous resident and had visited the house. The officer also testified, the court found, that the downstairs unit is completely separate from the upstairs unit described in the search warrant. None of these findings were challenged by the State. Based on these findings, the court determined that Officer Segobia knew or should have known that the residence was a multi-unit dwelling with more than one occupant. Thus, the evidence in the record supports this finding of fact and therefore it was not clearly erroneous.[18]

---

[18] The ICA found that Officer Segobia's knowledge of the downstairs unit's particulars was not extensive, as he thought, although he was not sure, that there was an internal staircase. Although Officer Segobia testified that the CI "wasn't 100 percent [sure] if there would be a stairwell within [Rodrigues'] unit" and also testified that, "I almost want to say there used to be a stairwell and it got blocked off from the bathroom area, if I remember correctly," the circuit court implicitly rejected this testimony based on the complete lack of evidentiary support for the prior existence of a stairwell or a "blocked" staircase. This rejection was based upon the actual knowledge and descriptions of the officer regarding the Rodrigues' unit, particularly his earlier presence in the unit, as the circuit court determined that the Officer knew or should have known that the residence was a multi-unit dwelling with more than one occupant.

The court's findings demonstrate that the residence would not "be taken to be a single-occupancy structure" from its outward appearance and that Officer Segobia "knew or had reason to know of the structure's actual multiple-occupancy character" prior to the execution of the warrant. Anderson, 84 Hawaiʻi at 468, 935 P.2d at 1013 (quoting 2 LaFave, supra, § 4.5(b), at 526-29). Either determination rendered the search warrant invalid, and the circuit court thus correctly concluded that the search warrant in this case failed to describe with particularity the place to be searched, despite the officer having sufficient information to do so.[19] Accordingly, the State's challenge to the circuit court's COL 9 that the warrant did not describe at all the separate studio unit located downstairs and its challenge to COL 11 that the search warrant did not describe and therefore did not authorize the search of the separate downstairs unit lack merit.

---

[19] The ICA found, however, that the residence was not a multiple-occupancy dwelling because the evidence did not demonstrate that Rodrigues maintained exclusive access to the lower unit as Officer Segobia had information that all of the family members had access to the entire house. The cases relied upon by the ICA addressing a person's "exclusive access" to a residential unit involved a residence in which multiple people shared a common area but had separate bedrooms, not an entirely separate living unit as in this case. Additionally, there was no evidence that anyone besides Rodrigues had access to the downstairs unit other than Ms. Rodrigues, who rented the unit to Rodrigues and thus had keys to it. And Officer Segobia's speculation that "it appeared that everybody would have access to other people's areas" in the residence was not based on information provided by Ah Nee and, in fact, was contrary to his knowledge that Ah Nee and his wife lived in the downstairs unit separate from Rodrigues and Ms. Rodrigues.

Because the search warrant in this case failed to satisfy the particularity requirement of article I, section 7 of the Hawai'i Constitution, it was invalid.  See Anderson, 84 Hawai'i at 468, 935 P.2d at 1013 ("A search warrant for a[] . . . multiple-occupancy building will [] be held invalid if it fails to describe the particular subunit to be searched[.]").

The ICA nevertheless concluded that it was error for the circuit court to conclude that the warrant was deficient for the failure to specifically describe the lower unit.  As explained, the circuit court determined that the outward appearance of the residence suggests that the downstairs is a separate unit.  Additionally, based on the building's appearance, the information that the officer received from Ah Nee, and the officer's prior visit to the residence, the court determined that Officer Segobia knew or should have known that the residence was a multi-unit dwelling with more than one occupant.  Neither finding was challenged by the State before the ICA.  Whether the downstairs unit appeared to be separate based on the "outward appearance of the residence" was plainly a factual finding, determined by the circuit court based upon the testimony and photographs of the exterior of the structure

introduced into evidence at the hearing.[20]  It is well-established that appellate courts must review challenged findings of fact under the clearly erroneous standard and that unchallenged findings of fact are binding upon appellate courts. Kelly v. 1250 Oceanside Partners, 111 Hawaiʻi 205, 227, 140 P.3d 985, 1007 (2006); Okada Trucking Co. v. Bd. of Water Supply, 97 Hawaiʻi 450, 458, 40 P.3d 73, 81 (2002).  The ICA nonetheless found that the residence had the "outward appearance of community occupation."  Because the circuit court's unchallenged finding was binding on the ICA, it was error for the ICA to make a factual finding as to the appearance of the structure that was contrary to the circuit court's finding.  See Kelly, 111 Hawaiʻi at 227, 140 P.3d at 1007.

        Similarly, the circuit court's determination that Officer Segobia knew or should have known that the residence was a multi-unit dwelling with more than one occupant was a factual determination; it involved the court examining the evidence regarding the appearance of the residence, the information that the officer received from Ah Nee, and the officer's prior visit to the residence.  But the ICA determined that Officer Segobia

---

[20]     Some of the circuit court's findings of fact in this case were labeled as conclusions of law.  We have recognized, however, that "a finding of fact is not freely reviewable by reason of its label as a conclusion of law."  Molokoa Vill. Dev. Co. v. Kauai Elec. Co., 60 Haw. 582, 596, 593 P.2d 375, 384 (1979).

did not have sufficient knowledge that the residence was a multi-unit dwelling.  It was error for the ICA to make a determination regarding Officer Segobia's knowledge of the character of the residence that was contrary to an unchallenged finding made by the circuit court to which the ICA was bound.  Id.  Thus, the ICA erred in not accepting the circuit court's findings of fact and in concluding the particularity requirement was satisfied.  See Anderson, 84 Hawai'i at 468, 935 P.2d at 1013.

## B. The Search Violated Rodrigues' Constitutional Rights

It is well-established that any warrantless search of a constitutionally protected area is "presumptively unreasonable unless there is both probable cause and a legally recognized exception to the warrant requirement."  State v. Phillips, 138 Hawai'i 321, 336, 382 P.3d 133, 148 (2016); State v. Wallace, 80 Hawai'i 382, 393, 910 P.2d 695, 706 (1996); State v. Bonnell, 75 Haw. 124, 137, 856 P.2d 1265, 1273 (1993).  There has been no assertion at any point in the course of this litigation that an exception to the warrant requirement applied.  Thus, the search of Rodrigues' residence violated his constitutional right against unreasonable searches under article I, section 7 of the Hawai'i Constitution.  The circuit court properly granted

Rodrigues' motion to suppress, and the ICA erred in vacating the circuit court's Findings of Fact and Conclusions of Law.

### V. CONCLUSION

Accordingly, the ICA's April 10, 2019 Judgment on Appeal is vacated, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Taryn R. Tomasa<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Kauanoe A. Jackson<br>for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

