**Electronically Filed
Intermediate Court of Appeals
CAAP-20-0000485
28-JAN-2022
12:01 PM
Dkt. 80 MO**

NO. CAAP-20-0000485

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF DM

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-J NO. 0101376)

MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Hiraoka, J., with
Nakasone, J., dissenting)

## I.  Introduction

Minor-Appellant/Cross-Appellee DM (**Minor**) appeals from the November 15, 2019 "Order Re: Motion for Reconsideration of Order Adjudicating Minor of Attempted Assault in the First Degree and Restitution Filed October 29, 2019" and the July 24, 2020 "Findings of Fact and Conclusions of Law" (**FOFs/COLs**) entered by the Family Court of the First Circuit (**Family Court**).[1]  After a bench trial, the Family Court adjudicated Minor a law violator under Hawaii Revised Statutes (**HRS**) § 571-11(1) (2018)[2] for

---

[1]  The Honorable Brian A. Costa presided.

[2]  HRS § 571-11(1) provides:

> **§571-11 Jurisdiction; children.**  Except as otherwise provided in this chapter, the court shall have exclusive original jurisdiction in proceedings:
>     (1)  Concerning any person who is alleged to have committed an act prior to achieving eighteen years of age that would constitute a violation
>                                        (continued...)

committing Attempted Assault in the First Degree (**Attempted Assault 1**) in violation of HRS §§ 705-500 (2014)[3] and 707-710(1) (2014).[4]

On appeal, Minor challenges several of the Family Courts FOFs and COLs,[5] and argues that the Family Court erred in concluding that (1) he intentionally stabbed the complaining witness (**CW**) with his knife; (2) his use of deadly force in self-defense was not justifiable under the circumstances because it exceeded the amount of force that was reasonable; (3) he could have avoided the necessity of force by retreating to complete safety; and (4) the State disproved that Minor acted in self-defense beyond a reasonable doubt.

On cross-appeal, Plaintiff-Appellee/Cross-Appellant State of Hawaiʻi (**State**) appeals from the (1) June 29, 2020 "Order Re: Contested Restitution Hearing"; (2) July 16, 2020 "Order Denying State's Motion to Reconsider June 29, 2020 Order

---

[2](...continued)
> or attempted violation of any federal, state, or local law or county ordinance.  Regardless of where the violation occurred, jurisdiction may be taken by the court of the circuit where the person resides, is living, or is found, or in which the offense is alleged to have occurred[.]

[3]  HRS § 705-500 provides, in relevant part:

> **§705-500 Criminal attempt.**  (1) A person is guilty of an attempt to commit a crime if the person:
>
> . . .
>
> (b)   Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

[4]  HRS § 707-710 provides, in relevant part:

> **§707-710 Assault in the first degree.**  (1) A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person.

[5]  Minor challenges FOFs 12, 13, 17, 26, 27, 31, 37, and 40-44 and COLs 3, 4, 6, 8, 9, and 11-14.

2

Denying Restitution"; and (3) July 16, 2020 "Amended Order Re: Contested Restitution", all entered by the Family Court.[6] In its cross-appeal, the State contends the Family Court erred in concluding that the Crime Victim Compensation Commission (**CVCC**) was not a "victim" under HRS § 571-48 (11) and (13) (2018)[7], placing the burden on the State to show that Minor or his parents had the ability to pay restitution, and holding CW could not be compensated directly.

For the reasons discussed below, we affirm.

## II. Background

The pertinent background adduced from the three-day bench trial is as follows.

### Testimony of CW

CW testified that he lived in Ewa Beach and attended a friend's birthday party at "Hau Bush" beach park (**Hau Bush**) in Ewa Beach in the early morning of June 2, 2019; there, he saw Minor, whom he had not met before. CW testified that he approached Minor, but Minor did not want to talk so CW stepped away until Minor yelled "Kalihi Mafia." CW responded, "F[uck] Kalihi Mafia. Ewa Beach[,]" and called Minor to fight. Minor asked CW if he was serious and then CW "just punched him" because Minor yelled "Kalihi Mafia" which CW knew was a gang in Kalihi.

CW testified that he and Minor "[fought] for a couple seconds swinging at each other, and then [CW] tackled him to . . . the floor." Minor then "got up, went to the car, grabbed the

---

[6] The Honorable John C. Bryant, Jr. presided.

[7] HRS § 571-48 provides, in relevant part:

> (11) The court may order any person adjudicated pursuant to section 571-11(1) to make restitution of money or services to any victim who suffers loss as a result of the child's action, or to render community service;
> . . . .
> (13) The court may order the parents of an adjudicated child to make restitution of money or services to any victim, person, or party who has incurred a loss or damages as a result of the child's action.

knife."  CW stated that the cars were five to twenty feet from where they fought and CW knew Minor had a knife because "[e]verybody yelled he had a knife[.]"  Minor yelled "who like get stab?" as Minor approached CW.  CW then threw punches at Minor and Minor stabbed CW.  CW did not immediately realize he had been stabbed and continued swinging punches at Minor and tackled Minor again.  Minor became aware he had been stabbed after he stood up "feeling weird" and noticed "it started to hurt and then started bleeding."  CW's lower left ribs was gushing blood onto his shorts.  He rushed to his friend's car and went to the hospital, where he received surgery for his injuries.

On cross-examination, CW testified that he got into a different altercation with another male at Nimitz Beach earlier that night but he did not start it.  CW also testified that he drank two twelve-ounce cans of Four Loko, some Malibu rum and smoked marijuana earlier that night.  CW stated that it was not his first night drinking alcohol and that it takes "10 beers" to get drunk.

### Testimony of Eyewitness Hunter

Nineteen-year-old Hunter Zeller-Cortes (**Hunter**) testified that he is CW's friend, was at Hau Beach the night of the incident, and met Minor a couple of days before that night. Hunter testified that he heard what sounded like "a lot" of people arguing, but only saw CW and Minor arguing.  He did not see the fight begin, but saw both Minor and CW using their fists on each other.  Hunter testified that during the fight, he tried to break it up and that "a couple people [were] holding them back and then [Hunter] was in the middle pushing them away."  Hunter testified he broke up the fight and then walked away from the area with his friend who had been hit by someone other than CW or Minor during the fight.  Hunter was calming his friend down and "less than [a] couple minutes" later, Hunter saw Minor leave in a car with one other person. He then found CW in the back seat of Hunter's car, and helped CW up, but CW punched him.  Hunter

looked at his shirt and saw blood so he helped CW into the back of his friend's truck and they left for the hospital.

### Testimony of Eyewitness KJ

Seventeen-year-old KJ testified that she was at Hau Beach with a couple of friends, including Hunter, CW, and EO on the night of the incident.  She had not met Minor previously and did not know how the first altercation started.  CW and Minor were yelling at each other, and she and Hunter were trying to calm CW down.  KJ saw CW run around the cars to face Minor and saw Minor pull a knife from a car.  CW then tackled Minor and was stabbed.  KJ testified that Minor's knife just went in like "when someone hits but with a knife."

On cross-examination, KJ testified that while Minor and CW were still separated, Minor took out his knife and said "you like get shanked?"  After Minor said "you like get shanked?" CW ran toward Minor because "[CW] got mad at the fact that [Minor] said that."  It took CW between ten to thirty seconds to reach Minor, CW tackled Minor and they ended up on the ground.  KJ testified that she saw the initial round of fighting and explained, "[Minor and CW] were like both trying to fight.  And I guess when [CW] swung, he missed, and then that's when [Minor] stuck, [sic] and then [CW] tackled [Minor]."  During the first fight, other individuals were getting "rowdy" but KJ did not see if other people were hitting Minor.

### Testimony of Eyewitness EO

Seventeen-year-old EO is CW's close friend and he did not know Minor.  EO testified that he was at Hau Beach on the night of the incident and at one point, an argument broke out between two "sides" of the beach park.  He only saw CW and "some other guy on the other side."  CW was yelling "Ewa Beach," and someone else yelled "Kalihi," but he was not sure how many people were yelling.  At one point there was an argument, then a "slight fight" between CW and the other boy, with a "couple punches" thrown.  EO initially testified his friends broke up the fighting by "telling us to stop" but then denied being personally involved

and claimed they were only talking to CW.  He saw CW fighting with "one or two" people, but did not know who they were.  After the initial fight ended, "they went back to their places" and then "came back arguing."  After they started arguing, the other boy pulled out a knife from his pocket, then CW broke out from being held back and tackled Minor.  They both fell, then CW got up asking to go to the hospital.  He believed the altercation involving the knife was only between CW and the boy.

EO testified on cross-examination that he and CW are "really close," and they were both drinking earlier that night at Nimitz Beach.  He did not see the initial arguing but saw that CW threw the first punch and they both ended up on the ground.  Later, CW tackled the boy by "launch[ing] himself off the ground" and "flying his . . . body towards him."  They both fell, and that is when CW got stabbed.  When the boy pulled out the knife, he said "you like get stabbed," then CW "broke out" to tackle the boy despite multiple people trying to hold him back.  Minor did not move from the spot where he stood when he made his threat, but when CW broke out, CW took long strides and quickly launched himself in the air to tackle Minor.  Most people there were from Ewa Beach.  It was pitch-black that night, and the only light was from open car doors.

**Testimony of Minor**

Minor testified that the night of the incident, his cousin picked him up in his car, and they went out "looking for parties."  He learned through social media about a party at Hau Bush.  Minor had a "couple beers," but his cousin did not drink because he was the designated driver.  There were about twenty cars at Hau Beach when they arrived, and it was pitch black outside except for the lights from open car doors.  On arrival, Minor went to talk to "some girls," and his cousin went to meet his friends, but Minor did not know exactly where he was.  CW and a "couple . . . other guys" approached Minor and started introducing themselves.  CW was initially friendly.  CW held a twenty-two ounce can of Four Loko, smelled like alcohol, had

glossy eyes, and kept talking to Minor.  CW asked Minor to sip his drink but Minor declined; CW's friendliness began to feel "sketchy," so Minor asked CW to leave.  Minor continued talking to a girl, then CW "came out of nowhere" and disrespected the girls who were standing by Minor, calling them "bitch and slut." Minor told CW to "chill" and to get away, but CW was "all drunk" and started getting "all nuts" after that.  CW began "calling [Minor] out" to fight, but Minor declined and tried to reason with him, repeatedly saying he did not want any problems.  CW was not wearing a shirt and he had a cigarette in his hand.  CW continued calling him out and said "where you from?"; Minor responded, "Kalihi," then CW said "oh, fuck Kalihi," then Minor said "oh, fuck Ewa Beach," then CW rushed him and started to throw punches, and Minor threw punches to defend himself.  Hunter and some boys broke up the fight by holding CW back as Minor stood there watching, but CW was able to break away and rushed at Minor again.  "People" then tried to pull CW back and "there was a whole lot of chaos."  Minor and CW both ended up on the ground because CW "rush[ed] at [him] so fast," and when Minor got up, he got "whacked" from the side by someone other than CW.  He could not see in the darkness, but he knew someone other than CW hit him because CW was still on the ground.  He had no friends there other than his cousin, and the rest of the people were from Ewa Beach.  He was punched again and saw that "choke people was getting nuts."  He looked around and saw a lot of people, so he went to his cousin's car and grabbed his work knife.  He used the knife at work, and in emergencies it has a seat belt cutter and can be used to break glass.  The blade on the knife has to be manually pulled out and is three or four inches long.  He did not have the keys to the car, but it was already open.  He went to the car because he was scared as there were a lot of people there, and he was outnumbered and getting punched.  When he grabbed the knife, there were "more boys coming to rush" him, and CW was with the group of boys coming.  He then turned and said, "what, you guys -- who like get stab?" to make his attackers

"back away," and "make them scared," but he did not want to hurt anybody.  Minor stood in the same place the whole time while making the threat.  CW was about ten feet away at the time, and when the "other boys" saw the knife, they backed away.  CW then said, "I no give a fuck if you have the knife," and rushed towards Minor.  CW ran and jumped at Minor, and Minor swung and tried to "catch" him, which is when the knife "made contact" somewhere on CW's body.  CW "started throwing blows" while Minor was on his back and CW was on top; Minor still held the knife and was blocking the blows with both hands until CW finally rolled over from his injury and retreated.  Minor saw the blood on his shirt, then stood up and looked for his cousin, finding him with his friends on the "other side," about five cars away.  He told his cousin, "[L]et's get out of here," and when the cousin asked why, he said "[F]rick, I accidentally stabbed somebody."

Minor testified on cross-examination that he travels with his knife all the time because he uses it for work.  His purpose in getting the knife was to scare away CW and the "other boys."  When CW launched his attack, he came head first, Minor was not thinking, and he "tried to wrap him" with the knife still in his hand.  They were on the ground for about ten seconds before CW rolled over.  CW was not armed, and nobody else produced a weapon that night.  CW is about Minor's size but is a "much better" fighter.  He did not know where his cousin was during the fight, and though he had his phone, he did not have time to call him.

### Family Court adjudication

The Family Court made the following relevant FOFs in which it found, *inter alia*, that Minor intentionally stabbed the CW and was not justified in his use of deadly force:

> 11.  [CW] further admitted that he started the fight with Minor, and that he threw the first punch. He stated that others were trying to break it up. The complaining witness stated that he was trying to get back at the Minor, and that at some point the altercation stopped. The Court found this testimony credible.
>
> 12.  [CW] stated that the Minor went to a vehicle, went inside the vehicle, got a knife, and that the Minor stated

"who like get stabbed." [CW] the[n] immediately approached the Minor again. The Court found this testimony credible.

13. [CW] was stabbed during this second altercation with the Minor, and he sustained a stab wound to the area of his left abdomen by the Minor, with the knife that the Minor had procured from the vehicle.

. . . .

16. [KJ] testified that she did not see the first altercation. She stated that [CW] was upset, and that she was trying to calm him down. She stated both sides were yelling. She testified that saw the Minor with the knife, and that the Minor said something to the effect of "who like get stabbed" or "shanked." She stated that once the Minor came out with the knife, she saw [CW] charge after the Minor and tackle him. She saw the Minor strike [CW], which looked to her like a hit, but with a knife. She stated she did not see anyone else hit the Minor.

. . . .

18. The Court finds based upon the credible testimony that the initial confrontation between the Minor and [CW] was started by [CW] when he threw the first punch. [CW] was intoxicated on the night of the incident, June 2, 2019.

. . . .

22. The first altercation was partially broken up when Hunter Zeller-Cortez stepped in between and attempted-to break up the fight, which then continued somewhat as a second altercation that the Court views as a continued part of the first altercation.

23. After the fight was broken up, it was at that point that the Minor went over to a vehicle, the Nissan Altima that his cousin had driven him to Hau Bush in. The Minor retrieved a knife that he used for work. Upon retrieving the knife, the Minor exited the vehicle, and yelled out "who like get stabbed."

24. At that point, the Court finds that other people were attempting to calm [CW] down, but they were unsuccessful.

25. The Court finds that [CW] charged at the Minor while minor was holding the knife.

26. When [CW] ran up to Minor, the Minor did stab [CW] in the left side of his abdomen.

27. The Minor testified that the stab was an accident, and that he was trying to hug and/or catch [CW]. The Court does not find that to be credible testimony. The Court finds that the Minor did in fact stab, and did intend to stab the complaining witness with the knife that was produced.

. . . .

29.   After the second altercation, when the Minor extricated himself from the situation, the Minor went to the vehicle, obtained a knife from the vehicle, came back out of the vehicle with the knife, and stated "who like get stabbed." At that point, [CW] charged at the Minor.

. . . .

31.   The Court finds that the culmination of the act in the stabbing did create a substantial risk of death to [CW]. The Court further finds that the acts were done so intentionally.

32.   Self-defense was raised by the defense in this matter, and once reasonably raised, the burden is on the prosecution to prove beyond a reasonable doubt that the force used by the Minor was not justifiable.

. . . .

34.   In this case, the utilization of the weapon, the knife, is deadly force.

35.   In order for deadly force to be utilized, it must be met and used only for specific purposes, and that force utilized must be reasonable.

36.   Minor claimed he was assaulted not only by the complaining witness but that somebody else had struck him, which then caused him to extricate himself from the situation and go to the vehicle.

37.   The Minor could have gone to the vehicle and instead of getting the knife could have extricated himself from the situation if he stayed in the vehicle or he could have left the area but chose not to do so.

38.   The Minor was entitled to utilize self-defense in the first altercation.

39.   When the second altercation occurred, the Minor was also entitled to use self-defense, but only such force that was reasonably necessary under the circumstances.

40.   The Court finds that the Minor used deadly force when he stabbed [CW]; and deadly force exceeded the amount of force that was reasonable under the circumstances.

41.   While the Minor may have subjectively believed that such deadly force was necessary, the Court does not find that the amount of force used was objectively reasonable under the circumstances of this case, beginning and culminating with getting the knife from the vehicle, coming out of the vehicle instead of staying in the vehicle, making a threatening statement and ultimately resulting in Minor stabbing [CW].

42.   The mere brandishing and/or threat to cause death or serious bodily injury by the production of a weapon so long as the actor's intent is limited to creating an apprehension does not in and of itself constitute deadly force. However, retrieving the weapon from the vehicle, coming out of the vehicle with the weapon, making the threatening statement and ultimately using the weapon does constitute deadly force.

The Family Court made the following relevant COLs:

9.  "The use of force upon or towards another person is justified when the actor believes that such force is immediately necessary to protect himself against the use of unlawful force by the other person on the present occasion." HRS § 703-304(1) (2014). The reasonableness of the Minor's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the Minor's position under the circumstances of which the Minor was aware or as the Minor reasonably believed them to be. The amount of force used by Minor was not reasonable under the circumstances.

10.  "Deadly force" means force which the actor uses with the intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm." HRS § 703-300 (2014). The act of Minor stabbing [CW] in the abdomen constituted deadly force.

11.  "The use of deadly force is justifiable ... if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy."  HRS § 703-304(2). The Court does not find the use of deadly force by Minor was justifiable, and the use of said force was not objectively reasonable under the circumstances in this case.

12.  "The use of deadly force is not justifiable ... if the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or [t]he actor knows that he can avoid the necessity of using such force with complete safety by retreating[.]" HRS 703-304(5). Minor left the area to obtain a weapon, the knife, from a vehicle and returned and stated "who like get stabbed." The confrontation was broken up, but Minor chose to return with the weapon, ultimately stabbing [CW]. Minor could have waited in the vehicle or left the area with complete safety.

13.  The prosecution proved beyond a reasonable doubt that the force used by Minor was not justifiable.

## III. Discussion

### A.    Minor's Appeal

#### 1.    The Family Court's FOFs Are Not Clearly Erroneous For Omitting Details

Minor contends that FOFs 12, 13, 17, and 26, and COL 12 are clearly erroneous because "they fail to convey numerous important details . . . which affected the applicability of [Minor's] defense of self-defense[.]"  Minor also contends that all FOFs are erroneous for omitting facts and contextual details which are "important to providing a complete picture of the events[.]"

"A trial court's FOF are reviewed under the 'clearly
erroneous' standard." <u>Dan v. State</u>, 76 Hawai‘i 423, 428, 879
P.2d 528, 533 (1994).  A finding of fact is clearly erroneous
when the record lacks substantial evidence to support the
finding.  <u>State v. Okumura</u>, 78 Hawai‘i 383, 392, 894 P.2d 80, 89
(1995) (citation omitted).  "[A] conclusion of law that presents
mixed questions of fact and law is reviewed under the clearly
erroneous standard because the court's conclusions are dependent
upon the facts and circumstances of each individual case."  <u>State
v. Rapozo</u>, 123 Hawai‘i 329, 336, 235 P.3d 325, 332 (2010)
(citation omitted).

Minor challenges the following underlined portions of
the FOFs and COLs:

> [FOF] 12.  [CW] stated that the Minor went to a
> vehicle, went inside the vehicle, got a knife, and
> that Minor stated "who like get stabbed." [CW] the[n]
> <u>immediately approached</u> the Minor again.  The Court
> found this testimony credible.

> [FOF] 13.  <u>[CW] was stabbed during this second
> altercation with the Minor</u>, and he sustained a stab
> wound to the area of his left abdomen by the Minor,
> with the knife that the Minor had procured from the
> vehicle.

> . . . .

> [FOF] 17.  <u>[EO] saw the first altercation, during which [CW]
> threw the first punch at Minor.  He also saw the second
> altercation in which [CW] tackled the Minor, and at that
> point, [CW] was stabbed by Minor. He further stated that he
> heard the Minor state previous "you like get stabbed."</u>

> . . . .

> [FOF] 26.  <u>When [CW] ran up to Minor, the Minor did stab
> [CW]</u> in the left side of his abdomen.

> . . . .

> [COL] 12.  "The use of deadly force is not justifiable . . .
> if the actor, with the intent of causing death or serious
> bodily injury, provoked the use of force against himself in
> the same encounter; or [t]he actor knows that he can avoid
> the necessity of using such force with complete safety by
> retreating[.]"  HRS 703-304(5).  Minor left the area to
> obtain a weapon, the knife, from a vehicle and <u>returned and
> stated "who like get stabbed."  The confrontation was broken
> up, but Minor chose to return with the weapon, ultimately
> stabbing [CW]. Minor could have waited in the vehicle or
> left the area with complete safety.</u>

Minor contends that the words "immediately approached" in FOF 12 and the underlined language in FOFs 13, 17, and 26 "do not convey the force, intensity, and quickness of [CW's] actions, which led to his injury."  Minor quotes portions of EO's testimony in which he explained CW's tackle was not similar to an American football tackle but was "like flying his - - his body towards [Minor] . . . like jumping at [Minor]."

We have held that:

> where an appellant alleges that the trial court failed to make adequate findings of fact, the appellate court will examine all the findings, as made, to determine whether they are (1) supported by the evidence; and (2) sufficiently comprehensive and pertinent to the issues in the case to form a basis for the conclusions of law. If those findings include sufficient subsidiary facts to disclose to the reviewing court the steps by which the lower court reached its ultimate conclusion on each factual issue, then the findings are adequate.

State v. Ramos-Saunders, 135 Hawaiʻi 299, 304, 349 P.3d 406, 411 (App. 2015) (brackets omitted) (quoting Nani Koolau Co. v. K & M Const., Inc., 5 Haw.App. 137, 140, 681 P.2d 580, 584 (1984)). Moreover, "[t]he trial judge is required to only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts."  Id. at 304-05, 349 P.3d at 411-12 (quoting Rezentes v. Rezentes, 88 Hawaiʻi 200, 203, 965 P.2d 133, 136 (App. 1998)).

In this case, the Family Court's findings which described CW "charged" (FOFs 16, 25, and 29), "ran" (FOF 26), and "tackled" (FOFs 16 and 17) Minor while Minor held the knife sufficiently indicated the force of CW's actions which led to the stabbing.  Thus FOFs 12, 13, 17, and 26 are not clearly erroneous.

Minor contends the underlined wording in FOFs 13 and 26 implies Minor stabbed CW while they stood facing each other. However, the Family Court found in FOF 17 that CW was stabbed when he tackled Minor.  The omission of this detail in FOFs 13 and 26 do not make them clearly erroneous.

Minor argues it was clearly erroneous for the Family court to omit the following facts from its FOFs:

1.  [CW] had been drinking earlier that night at Nimitz Beach.

2.  [CW] had gotten into a fight with another male at Nimitz Beach.

3.  [CW] was walking around shirtless at the Hau Bush party.

4.  After [Minor] came out of the car with the knife and stated, "Who like get stabbed?" the other boys approaching [Minor] with [CW] backed off.

5.  After running at/jumping at/tackling [Minor] (who was holding the knife) to the ground, [CW] continued to punch [Minor] a couple more times before his injury stopped him.

6.  The vast majority of people at the Hau Bush party were from 'Ewa Beach, and [Minor] was the only individual from Kalihi.

7.  [Minor]'s only ally was his cousin, who was not in the immediate area of the first and second altercations between [CW] and [Minor], and was apparently unaware of the fight.

(Citations to the record omitted).[8]

Minor does not indicate that he requested that the Family Court make his asserted findings.  See Hawai'i Family Court Rules (**HFCR**) Rule 52(b).  Moreover, Minor argues that these additional findings "provided critical contextual details (i.e., flavor) to the events[.]"  However, over-elaboration of detail or particularization of facts is not necessary.  See Ramos-Saunders, 135 Hawai'i at 304-05, 349 P.3d at 411-12.  Therefore, the omission of these additional details from the Family Court's FOFs was not clearly erroneous.

## 2.    The Family Court Did Not Err in Concluding Minor's Use of Deadly Force Was Not Justified

Minor argues that the Family Court erred in concluding he stabbed CW intentionally rather than accidentally and that Minor's use of deadly force was justified because he could not retreat with complete safety.  We disagree.

---

[8]  Minor also argues that none of the FOFs reflect EO's testimony that multiple people were trying to hold CW back but he broke free and ran at Minor.  However, the Family Court found in FOFs 23 and 24 that when Minor exited the vehicle and yelled out "who like get stabbed[,]" other people were attempting to calm CW down but were unsuccessful. Therefore, this argument is without merit.

Minor argues that COL 12 implies Minor intentionally or knowingly stabbed CW which is contradicted by the testimony of Minor and EO that Minor stayed where he was while CW tackled Minor which supports that Minor injured CW either accidentally or in self-defense.  Minor similarly argues that portions of FOFs 27 and 31, and COLs 4, 6, and 8 which state that Minor intentionally stabbed CW are clearly erroneous because CW was the aggressor and the stabbing was accidental.  Minor supports his argument with his own testimony, *inter alia*, that he "didn't want to hurt nobody[,]" and did not intend to stab CW.

Given the testimony of the various witnesses in this case, there is somewhat inconsistent evidence as to the events in question.  However, the Family Court made credibility determinations to which this court must defer.  "It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact."  In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001) (brackets omitted).

In FOF 27, the Family Court found:

> 27.  The Minor testified that the stab was an accident, and that he was trying to hug and/or catch [CW]. The Court does not find that to be credible testimony.  The Court finds that the Minor did in fact stab, and did intend to stab the complaining witness with the knife that was produced.[9]

Minor's contention that he did not intend to stab CW is based on Minor's own testimony which the Family Court found not credible. Moreover, based on the record -- including the evidence that after being hit by CW, Minor retrieved the knife from his cousin's car, exited the vehicle, and yelled out "who like get stabbed" -- there is substantial evidence to support the Family Court's finding that Minor intended to stab CW when CW then charged at Minor while Minor was holding the knife.

Minor claims self-defense.  It is unchallenged that Minor used deadly force in this case, given his use of a knife.

---

[9]  In FOF 31, Conclusions of Law (**COL**) 4, and COL 8, the Family Court also made findings that Minor intentionally stabbed CW or acted intentionally in his conduct.

See FOF 34.  Thus, Minor claims he was justified in using deadly force.  HRS § 703-304 (2014) provides, in pertinent part:

> (2)  The use of deadly force is justifiable under this section <u>if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury,</u> kidnapping, rape, or forcible sodomy.
>
> . . . .
>
> (5)  The use of deadly force is not justifiable under this section if:
>
> . . .
>
> (b)  The actor <u>knows that he can avoid the necessity of using such force with complete safety by retreating</u> or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take[.]

(Emphases added).

Minor contends the Family Court erred in relying on HRS § 703-304(5)(b) because the State failed to prove the statutory requirement that Minor subjectively knew he could avoid the necessity of using deadly force with complete safety by retreating.  Although the Family Court did not expressly state that Minor had such subjective knowledge, it is implicit in the Family Court's FOF 37 and COL 12, which state:

> [FOF] 37.  The Minor could have gone to the vehicle and instead of getting the knife could have extricated himself from the situation if he stayed in the vehicle or he could have left the area but **chose** not to do so.
> . . .
>
> [COL] 12.  "The use of deadly force is not justifiable . . . if . . .[t]he actor knows that he can avoid the necessity of using such force with complete safety by retreating[.]" HRS 703-304(5).  Minor left the area to obtain a weapon, the knife, from a vehicle and returned and stated "who like get stabbed."  <u>The confrontation was broken up, but Minor **chose** to return with the weapon</u>, ultimately stabbing [CW].  Minor could have waited in the vehicle or left the area with complete safety.

(Emphasis added).  Moreover, the Family Court's other findings and the record support the finding that Minor knew he could avoid the necessity of using deadly force with complete safety by retreating.  In FOF 11, which is <u>unchallenged</u>,[10] the Family Court

_____

[10]  Unchallenged findings are binding on an appellate court.  <u>See</u> <u>Okada Trucking Co. v. Bd. of Water Supply</u>, 97 Hawaiʻi 450, 458, 40 P.3d 73, 81

(continued...)

found credible the CW's testimony that he started the fight with Minor, others were trying to break it up, and "at some point the altercation stopped."  (Emphasis added).  FOF 23, also unchallenged, states in pertinent part that:

> After the fight was broken up, it was at that point that the Minor went over to a vehicle, the Nissan Altima that his cousin had driven him to Hau Bush in.  The Minor retrieved a knife that he used for work.  Upon retrieving the knife, the Minor exited the vehicle, and yelled out "who like get stabbed."

(Emphasis added).

Given these findings, when Minor went to his cousin's vehicle to retrieve the knife, the fight had been broken up. Although Minor testified he did not have the keys to his cousin's vehicle, the doors were open, Minor had his phone with him and his cousin was "somewhere around" the area but Minor did not attempt to call his cousin.  There is no indication that Minor was chased to his cousin's vehicle and nothing prevented Minor from remaining in the vehicle and calling his cousin so they could leave the area.[11]  Therefore, the record supports the Family Court's ruling that Minor's use of deadly force was not justified under HRS § 703-304(5)(b).

The record also supports the Family Court's determination that Minor's use of deadly force was not reasonable under the circumstances.  See HRS § 703-304(2); COLs 9, 10, 11. The commentary on HRS § 703-304 provides in relevant part as follows:

> Subsections (2) and (5) strictly limit the use of deadly force. Under the circumstances specified in subsection (2), the actor may use deadly force if he believes it is necessary to protect himself against death, serious bodily harm, kidnapping, rape, or forcible sodomy. This formulation

---

[10](...continued) (2002)  ("Findings of fact ... that are not challenged on appeal are binding on the appellate court.").

[11]  Minor argues that under the circumstances, he would not have been safe in the vehicle because he would have been a "sitting duck at the mercy of [CW] and his friends."  Thus, Minor appears to argue that when he went to his cousin's vehicle, the fight was not over and CW and/or CW's friends would continue the fight at the vehicle. This argument is not supported by any testimony and Minor does not challenge the Family Court's finding that when Minor went to his cousin's vehicle, the fight was broken up. Therefore, this argument is without merit.

has two implications: (a) the actor must believe that deadly force is the <u>only viable means of preventing the specified harm</u>, and (b) <u>the actor must believe that one of the specified harms is threatened on the present occasion</u>.

(Emphases added).

Given the record, there is sufficient evidence to support the Family Court's ruling on HRS § 703-304(2).  The Hawaiʻi Supreme Court has expressed that:

> We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

<u>State v. Matavale</u>, 115 Hawaiʻi 149, 157-58, 166 P.3d 322, 330-31 (2007).

The Hawaiʻi Supreme Court explained that "[t]he test for assessing a defendant's self-protection justification pursuant to HRS § 703-304 (2014) involves two prongs because HRS § 703-300 (2014) defines 'believes' as 'reasonably believes'[.]" <u>State v. Matuu</u>, 144 Hawaiʻi 510, 520, 445 P.3d 91, 101 (2019) (footnote omitted).

> The first prong is subjective; it requires a determination of whether the defendant had the requisite belief that deadly force was necessary to avert death, serious bodily injury, kidnapping, rape, or forcible sodomy.
>
> If the State does not prove beyond a reasonable doubt that the defendant did not have the requisite belief that deadly force was necessary, the factfinder must then proceed to the second prong of the test. This prong is objective; it requires a determination of whether a reasonably prudent person in the same situation as the defendant would have believed that deadly force was necessary for self-protection.

<u>Id.</u> at 520-21, 445 P.3d at 101-02 (ellipsis omitted).

In <u>Matuu</u>, the supreme court explained that a person of reasonable caution could conclude that upon "breaking free" from a fight when a third person intervened, it was not reasonable for the defendant to then go to the kitchen, obtain a knife, and

18

return to stab the decedent, who was unarmed.  Id. at 521, 445 P.3d at 102 (brackets omitted).

Here, the Family Court found:

38.  The Minor was entitled to utilize self-defense in the first altercation.

39.  When the second altercation occurred, the Minor was also entitled to use self-defense, but only such force that was reasonably necessary under the circumstances.

40.  The Court finds that the Minor used deadly force when he stabbed [CW]; and deadly force exceeded the amount of force that was reasonable under the circumstances.

41.  While the Minor may have subjectively believed that such deadly force was necessary, the Court does not find that the amount of force used was objectively reasonable under the circumstances of this case, beginning and culminating with getting the knife from the vehicle, coming out of the vehicle instead of staying in the vehicle, making a threatening statement and ultimately resulting in Minor stabbing [CW].

42.  The mere brandishing and/or threat to cause death or serious bodily injury by the production of a weapon so long as the actor's intent is limited to creating an apprehension does not in and of itself constitute deadly force. However, retrieving the weapon from the vehicle, coming out of the vehicle with the weapon, making the threatening statement and **ultimately using the weapon does constitute deadly force**.

(Emphases added).

Minor contends that he did not approach CW or anyone else with the knife, that Minor was being tackled to the ground by CW at the moment of the stabbing, and that Minor did not repeatedly stab CW or otherwise intend to injure CW, such that these factors support the conclusion that his use of deadly force was reasonable under the circumstances to protect himself from serious bodily injury at the hands of CW and his friends.  We disagree.

Even if Minor had the subjective belief that his use of deadly force was necessary, there is substantial evidence in the record to support the Family Court's determinations that a reasonably prudent person in the same situation would not have believed that the force exercised by Minor was immediately necessary for self-protection.

As stated above, in unchallenged FOF 23, the Family Court found that Minor went to his cousin's vehicle after the first altercation was broken up, retrieved the knife, and upon retrieving the knife, Minor exited the vehicle and yelled out "who like get stabbed."  We agree with the Family Court's ruling that Minor's use of deadly force in these circumstances was not objectively reasonable.  That is, a reasonably prudent person would not conclude, after the fight was broken up, that it was reasonable to go to the vehicle, retrieve a knife, yell out "who like get stabbed," and then stab CW when CW charged him.  There is no evidence that CW had any weapons.  Although Minor understandably would be upset by CW having initiated a fight with him, Minor acted in an objectively unreasonable manner by escalating the situation, after the fight was broken up.  Therefore, based on this record, we affirm the Family Court's ruling that Minor's use of deadly force was not justified under HRS § 703-304(2).

**B.    State's Cross-Appeal**

On cross-appeal, the State contends the Family Court erred in concluding that the CVCC was not a "victim" under HRS § 571-48 (11) and (13), placing the burden on the State to show that Minor or his parents had the ability to pay restitution, and holding CW could not be compensated directly.

**1.    Family Court's Interpretation of "Victim" in HRS § 571-48(11) and (13)**

HRS § 571-48(11) provides that the Family Court "may order any [juvenile offender] to make restitution of money or services to any <u>victim who suffers loss</u> as a result of the child's action, or to render community service[.]"  (Emphasis added).  In turn, HRS § 571-48(13) provides: "The court may order the parents of an adjudicated child to make restitution of money or services to any <u>victim</u>, person, or party who has incurred a

loss or damages as a result of the child's action."[12]  (Emphasis added).

Here, CW was the person who suffered loss as a result of Minor's act of stabbing.  The State contends, however, that the term "victim" as used in HRS § 571-48(11) and (13) should be interpreted broadly to include the CVCC because the CVCC paid CW's medical expenses, and the adult restitution statute defines a victim, *inter alia*, as "[a] governmental entity that has reimbursed the victim for losses arising as a result of the crime or paid for medical care provided to the victim as a result of the crime[.]" HRS § 706-646(1)(c) (2014).

> Where there is no ambiguity in the language of a statute, and the literal application of the language would not produce an absurd or unjust result, clearly inconsistent with the purposes and policies of the statute, there is no room for judicial construction and interpretation, and the statute must be given effect according to its plain and obvious meaning.

State v. Demello, 136 Hawaiʻi 193, 195, 361 P.3d 420, 422 (2015) (brackets omitted) (quoting State v. Palama, 62 Haw. 159, 161, 612 P.2d 1168, 1170 (1980)).

The State fails to show how the term "victim," as used in HRS § 571-48(11) and (13), is inherently ambiguous or will produce an absurd or unjust result.  The adult restitution statute, HRS § 706-646(1), starts with the phrase "[a]s used in this section" before setting out the expanded definition of "victim" to include business entities, trusts, surviving relatives, and governmental agencies.  Thus, by its own terms, the definition of "victim" in HRS § 706-646(1) is limited to that section.  Further, although HRS § 706-646(1) contains an expansive definition of "victim," that does not create an ambiguity in the use of the term "victim" in HRS § 571-48(11) or (13).  We do not interpret the plain meaning of "victim," as used in HRS § 571-48(11) and (13), to include the CVCC.

---

[12]  The State does not assert under HRS § 571-48(13) that the CVCC is a "person" or a "party" under that provision.

### 2. Ability to Pay Restitution

Given our determination above on the definition of "victim" under HRS § 571-48(11) and (13), we need not reach the State's point of error regarding the ability to pay issue.

### 3. Compensating CVCC Via Payment to CW

Finally, the State argues that the Family Court's holding that it is "inappropriate" to order Minor to pay restitution directly to CW and for CVCC to collect the restitution payments from CW is "flatly contradicted" by In re CM, which held:

> the Family Court did not err in concluding that family courts, like criminal courts, need not sort out insurance indemnities, subrogation rights, and/or other potential civil law implications before ordering a minor law violator to repay his or her victim under the family court restitution statute, HRS § 571-48(11).

141 Hawaiʻi 348, 355-56, 409 P.3d 752, 759-60 (App. 2017) (emphasis added).  The State further argues that the CVCC is entitled to reimbursement because, under In re CM, the CVCC acted like an insurance company in assuming the responsibility to pay CW's medical bills.

First, CW is not a party to this case, and the State fails to explain how the Family Court has jurisdiction over CW to order him to reimburse the CVCC if the court orders Minor to pay restitution.  Second, at the July 16, 2020 hearing, the State argued that the CVCC is "not a debt collector[,] [t]hey're not an insurer . . . and so there's no indemnity issues that apply in this particular case."  Thus, the State's argument on appeal that the CVCC is like an insurer entitled to reimbursement has been waived.  Moreover, even assuming *arguendo*, the CVCC is like an insurer, the State fails to explain how the applicable statutes or case law create an entitlement for an insurer to collect restitution payments from the victim.

Given the record in this case, we conclude the Family court did not err.

## IV.  Conclusion

Based on the above, we affirm the following entered by the Family Court of the First Circuit:

(1)  November 15, 2019 "Order Re: Motion for Reconsideration of Order Adjudicating Minor of Attempted Assault in the First Degree and Restitution Filed October 29, 2019";

(2)  the July 24, 2020 "Findings of Fact and Conclusions of Law";

(3)  June 29, 2020 "Order Re: Contested Restitution Hearing";

(4)  July 16, 2020 "Order Denying State's Motion to Reconsider June 29, 2020 Order Denying Restitution"; and

(5)  July 16, 2020 "Amended Order Re: Contested Restitution."

DATED:  Honolulu, Hawaiʻi, January 28, 2022.


On the briefs:

Brian R. Vincent,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee/
Cross-Appellant

Phyllis J. Hironaka,
Deputy Public Defender,
for Minor-Appellant/
Cross-Appellee

/s/ Lisa M. Ginoza
Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

<u>DISSENTING OPINION by Nakasone, J.</u>

I dissent because I would hold that the Family Court erroneously applied and rejected Minor's justification defense, and that Minor's adjudication for Attempted Assault in the First Degree should be reversed.  The erroneous application is summarized as follows.  First, it is the act of the stab itself that constitutes the "deadly force" in this case, and including Minor's acts preceding the stab (of getting the knife from the vehicle, coming out of the vehicle instead of staying in the vehicle, making a threatening statement "who like get stabbed") as part of "deadly force" was erroneous.  Second, the use of deadly force and the duty to retreat in a justification defense (self-defense) must be analyzed at the point the force is used, not before.  At the point the stab occurred, Minor was subjected to CW's head-first tackle and takedown of Minor, and the FOFs and COLs do not reflect that these circumstances contemporaneous with the stab were considered in the deadly force analysis, because the pertinent FOFs and COLs erroneously focus on Minor's acts preceding the stab.  Third, evaluating the reasonableness of Minor's belief that deadly force was necessary in self-defense requires both a subjective and objective analysis, yet the FOFs and COLs do not reflect that the subjective prong was sufficiently or correctly applied -- where the factfinder must consider the circumstances as Minor subjectively believed them to be at the time Minor used deadly force to defend himself. Fourth, the duty to retreat must also be analyzed subjectively, from Minor's perspective; and under this standard, there was no evidence to support the application of the duty to retreat in this case.  Fifth, an assault by multiple attackers is a special circumstance that must be considered when deadly force is used; this was not done in this case.  For these reasons, which I more fully explain below, I respectfully dissent.

The pertinent FOFs and COLs in my analysis are as follows:

FINDINGS OF FACT

. . . .

23.  After the fight was broken up, it was at that point that the Minor went over to a vehicle, the Nissan Altima that his cousin had driven him to Hau Bush in.  The Minor retrieved a knife that he used for work.  Upon retrieving the knife, the Minor exited the vehicle, and yelled out "who like get stabbed."

. . . .

29.  After the second altercation, when the Minor extricated himself from the situation, the Minor went to the vehicle, obtained a knife from the vehicle, came back out of the vehicle with the knife, and stated "who like get stabbed."  At that point, [CW] charged at the Minor.

. . . .

34.  In this case, the utilization of the weapon, the knife, is deadly force.

. . . .

36.  Minor claimed he was assaulted not only by the complaining witness but that somebody else had struck him, which then caused him to extricate himself from the situation and go to the vehicle.

37.  The Minor could have gone to the vehicle and instead of getting the knife could have extricated himself from the situation if he stayed in the vehicle or he could have left the area but chose not to do so.

38.  The Minor was entitled to utilize self-defense in the first altercation.

39.  When the second altercation occurred, the Minor was also entitled to use self-defense, but only such force that was reasonably necessary under the circumstances.

40.  The Court finds that the Minor used deadly force when he stabbed [CW]; and deadly force exceeded the amount of force that was reasonable under the circumstances.

41.  While the Minor may have subjectively believed that such deadly force was necessary, the Court does not find that the amount of force used was objectively reasonable under the circumstances of this case, beginning and culminating with getting the knife from the vehicle, coming out of the vehicle instead of staying in the vehicle, making a threatening statement and ultimately resulting in Minor stabbing [CW].

42.  The mere brandishing and/or threat to cause death or serious bodily injury by the production of a weapon so long as the actor's intent is limited to creating an apprehension does not in and of itself constitute deadly

2

force. However, retrieving the weapon from the vehicle, coming out of the vehicle with the weapon, making the threatening statement and ultimately using the weapon does constitute deadly force.

. . . .

CONCLUSIONS OF LAW

. . . .

10. "Deadly force" means force which the actor uses with the intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm." HRS § 703-300 (2014). The act of Minor stabbing [CW] in the abdomen constituted deadly force.

11. "The use of deadly force is justifiable ... if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy." HRS § 703-304(2). The Court does not find the use of deadly force by Minor was justifiable, and the use of said force was not objectively reasonable under the circumstances in this case.

12. "The use of deadly force is not justifiable ... if the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or [t]he actor knows that he can avoid the necessity of using such force with complete safety by retreating[.]" HRS [§] 703-304(5). Minor left the area to obtain a weapon, the knife, from a vehicle and returned and stated "who like get stabbed." The confrontation was broken up, but Minor chose to return with the weapon, ultimately stabbing [CW]. Minor could have waited in the vehicle or left the area with complete safety.

## 1. Only the act of the stab constitutes "deadly force."

The Family Court found that the "utilization of the weapon, the knife, is deadly force," that "minor used deadly force when he stabbed [CW]," and that "[t]he act of Minor stabbing [CW] in the abdomen constituted deadly force." FOFs 34, 40, COL 10. Thus, the Family Court found and concluded that the act of the single stab to CW's abdomen constituted "deadly force." See id.

In FOFs 41 and 42, the Family Court's inclusion of Minor's acts preceding the stab (getting the knife from the vehicle, exiting the vehicle with the knife), as part of the "force" and "deadly force" Minor used, was clearly erroneous.

3

See State v. Rodrigues, 145 Hawaiʻi 487, 494, 454 P.3d 428, 435 (2019) (a conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case). "Deadly force" means "force which the actor uses with the intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm." HRS § 703-300 (2014). "Force" means any "bodily impact . . . or the threat thereof." Id. The Family Court clearly erred in FOF 41 when it included the sequence and totality of Minor's prior acts of "getting the knife from the vehicle" and "coming out of the vehicle instead of staying in the vehicle" -- as part of the "force used" by Minor. FOF 41. FOF 42 contains a similar error, where the Family Court found that the sequence and totality of Minor's acts of "retrieving the weapon from the vehicle, coming out of the vehicle with the weapon . . . does constitute deadly force." FOF 42. None of these preceding acts in FOFs 41 and 42 constitute "deadly force" or "force," as they are defined in HRS § 703-300, and including them within the finding of "force" and "deadly force" was clearly erroneous. See Rodrigues, 145 Hawaiʻi at 494, 454 P.3d at 435. Including Minor's preceding acts in FOFs 41 and 42 as part of "force" and "deadly force," also contradicts the Family Court's finding that only the act of the stab constituted deadly force.

In both FOFs 41 and 42, the Family Court included Minor's act of "making the threatening statement" within its finding of "force" and "deadly force." The Family Court also noted in FOF 42, pursuant to the "deadly force" definition in HRS § 703-300, that: "The mere brandishing and/or threat to cause death or serious bodily injury by the production of a weapon so long as the actor's intent is limited to creating an apprehension does not in and of itself constitute deadly force." FOF 42. The Family Court explained that because the threatening statement was

4

not an isolated act, but was accompanied by Minor's additional acts of "retrieving the weapon from the vehicle, coming out of the vehicle with the weapon," and "ultimately using the weapon," the Family Court rejected finding that the threat was "limited to creating an apprehension" under HRS § 703-300.  FOF 42.

Respectfully, I disagree with this mixed finding and conclusion regarding the threat.  In my view, substantial evidence showed that Minor grabbed the knife out of fear because he was outnumbered and getting punched, and that he made the threat at CW and the group of boys coming to attack him to make them "back away" and "make them scared," but said he did not want to hurt anybody.  Minor stood in the same place the whole time while making the threat.  When the other boys saw the knife, they backed away, except for CW, who charged at and tackled Minor. Under HRS § 703-300, Minor's "intent [was] limited to creating an apprehension that [Minor] will use deadly force if necessary" and thus, the threatening statement "who like get stabbed" was not part of the deadly force in this case.  The Family Court clearly erred in including the threat as part of the deadly force at issue.  See Rodrigues, 145 Hawaiʻi at 494, 454 P.3d at 435.

2.    **Deadly force and the duty to retreat must be analyzed at the point the deadly force is used, and not before.**

Under HRS §§ 703-300, 703-304(1) and (2) (2014), Minor's use of deadly force against CW is justifiable if Minor reasonably believes that deadly force is "immediately necessary" to "protect himself against death [or] serious bodily injury" by CW "on the present occasion."  The Minor must believe that "immediate use of force is required," "that deadly force is the only viable means of preventing the specified harm," and that "one of the specified harms is threatened on the present occasion."  Commentary on § 703-304.  In a real conflict, circumstances are constantly changing, moment by moment.  An

5

actor's belief that deadly force is immediately necessary to protect himself or herself from death or serious bodily injury, may be reasonable throughout the duration of a conflict, for only certain periods of a conflict, for only an isolated moment during a conflict, or not at all, depending on the circumstances. Therefore, assessing the reasonableness of Minor's belief as to the necessity of Minor's use of deadly force, from the point he retrieved the knife from the vehicle, exited the vehicle, and made the threatening statement "who like get stabbed," rather than at the moment the stab occurred, was incorrect. See FOFs 41, 42, COL 12.  The "present occasion" which immediately necessitated Minor's use of deadly force was not when Minor retrieved the knife from the car, exited the car with the knife and made the threatening statement –- but was rather when Minor stabbed CW as CW tackled him.  HRS § 703-304(1).  The self-defense analysis must focus at this point, when deadly force was used –- not before.

The duty to retreat under HRS § 703-304(5) must also be analyzed at the point the deadly force is used, not before; and the Family Court's FOFs and COLs on the duty to retreat also erred in this regard.  See Matter of Y.K., 663 N.E.2d 313, 315 (N.Y. 1996) (holding that the duty to retreat does "not arise until the point at which deadly physical force was used or imminent.").[13]  In COL 12, the Family Court cited the duty to

_____

[13]     In Matter of Y.K., New York's highest court applied N.Y. Penal Law § 35.15 (2004), which provides that an "actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating[.]"  663 N.E.2d at 315.  There, a thirteen-year-old girl (**Girl**) was walking home from school with two friends, when a large group of boys and girls followed her, shouted threats and took turns hitting her on the head.  Id. at 314.  The Girl's companions fled to a nearby subway station, but the Girl chose not to join them, fearing that she might be thrown onto the tracks.  Id.  As she continued walking, she picked up a knife on the sidewalk and held it inside her jacket.  Id.  Shortly thereafter, the group pushed her down, held her, and began to punch and kick her, at which point she stabbed the main attacker in the head and back.  Id.  The trial court found that the Girl was not entitled to use deadly force as she failed to exercise her Duty to Retreat by not escaping to the subway with her friends.  Id.  The appellate court reversed, holding that the Duty to Retreat does "not arise until the point at which
(continued...)

retreat law under HRS § 703-304(5), then applied the duty as follows:  "Minor left the area to obtain a weapon, the knife, from a vehicle and returned and stated 'who like get stabbed.' The confrontation was broken up, but Minor chose to return with the weapon, ultimately stabbing [CW] . . . ."  This application was incorrect because the duty to retreat does not apply from the point the knife was retrieved from the car or brandished, but applies at the point the knife was used.  Here, the deadly force was employed as Minor was tackled by CW, and the duty to retreat must also be evaluated at that moment, and not before.  While what occurred before deadly force was employed is relevant, the duty-to-retreat determination must be based on the circumstances at the point deadly force was used.  See Matter of Y.K., 663 N.E.2d at 315.

### 3. The subjective prong of Minor's reasonable belief of the necessity of deadly force was insufficiently and incorrectly applied.

While the test for assessing a defendant's self-protection defense involves two prongs (subjective and objective), the FOFs and COLs reflect only an application of the objective prong, and, in my view, do not reflect a sufficient or correct application of the subjective prong to this case.

The two-pronged subjective-objective test from State v. Matuu, 144 Hawaiʻi 510, 520, 445 P.3d 91, 101 (2019) applied by the Majority is correct,[14] but the Matuu recitation of the

---

[13](...continued)
deadly physical force was used or imminent."  Id. at 315.  The New York Court of Appeals explained:  "At that point, when the kicking and punching started, the [Girl] was being held on the ground, surrounded by the 10 to 15 other members of the group and apparently without anyone in the area to help her. Manifestly, she was unable to retreat safely under those circumstances and her use of deadly physical force to defend herself was justified."  Id. (emphasis added).

[14]  The Majority analogizes Matuu in reaching its conclusion that the Family Court concluded deadly force was not justified in this case.  In Matuu, the supreme court explained that because Matuu testified that he was able to "break free" from a fight when his cousin (**Cousin**) intervened, it was not reasonable for Matuu to then "go to the kitchen, obtain a knife, and return to stab [the decedent], who was unarmed."  144 Hawaiʻi at 521, 445 P.3d at 102.
(continued...)

subjective-objective test does not contain additional explanatory language regarding the subjective prong that was present in the original case from which this test is derived, State v. Lubong, 77 Hawaiʻi 429, 433, 886 P.2d 766, 770 (App. 1994).  The omitted language explains how a factfinder must apply the subjective prong.  The bolded language below, from Lubong, has not been overruled, but has been omitted from subsequent precedent that has quoted and relied on the Lubong subjective-objective analysis:[15]

> In evaluating the reasonableness of a defendant's belief that deadly force was necessary for self-protection, the evidence must be assessed from the standpoint of a reasonable person in the defendant's position under the circumstances as the defendant subjectively believed them to be at the time he or she tried to defend himself or herself. *State v. Pemberton*, 71 Haw. 466, 477, 796 P.2d 80, 85 (1990).  The test for assessing a defendant's self-protection defense thus involves two prongs.

---

[14](...continued)
Here, however, the evidence including Minor's testimony, did not just consist of Minor going to the car after the fight was broken up, obtaining a knife like Matuu, to then return to stab an unarmed CW.  The stab in this case occurred when CW charged at Minor from ten feet away and tackled Minor headfirst, taking both of them to the ground, where CW then "started throwing blows" at Minor when Minor was on his back.

The record in Matuu also involved factual discrepancies that are not present here, regarding the degree of deadly force used by Matuu, and whether Matuu was defending himself or another, or not, at the moment of the stabbing.  Matuu claimed he stabbed the decedent once, yet the evidence showed that the decedent sustained four stab wounds and two incised wounds.  Id. at 514, 445 P.3d at 95.  Matuu asserted that he was defending himself and Cousin at the time he stabbed the decedent; yet Cousin gave contrary testimony that Cousin tried to stop Matuu from approaching the decedent with the knife, and Matuu cut Cousin's hand in the process.  Id.  Here, by contrast, the degree of deadly force and whether the deadly force was used in self-defense, were not disputed.  The deadly force consisted of a single stab.  All of the witnesses, Hunter, KJ, and EO, testified that Minor was defending himself from CW's tackle at the moment of the stab, and the Family Court also found this fact.  See FOF 39 (finding that Minor was entitled to use self-defense in second altercation).

[15]  The following Hawaiʻi Supreme Court cases cite the ICA's Lubong language explaining that application of the subjective prong requires the factfinder to place itself in the shoes of the defendant:  State v. Metcalfe, 129 Hawaiʻi 206, 232-33, 297 P.3d 1062, 1088-89 (2013); State v. DeLeon, 131 Hawaiʻi 463, 496 n.8, 319 P.3d 382, 415 n.8 (2014) (Acoba, J., concurring and dissenting, joined by Pollack, J.).  However, other supreme court cases, like Matuu, do not contain this subjective prong language from the Lubong subjective-objective test.  See State v. Williams, 147 Hawaiʻi 606, 615 n.10, 465 P.3d 1053, 1062 n.10 (2020); Matuu, 144 Hawaiʻi at 520-21, 445 P.3d at 101-02; In re Doe, 107 Hawaiʻi 12, 18 n.7, 108 P.3d 966, 972 n.7 (2005); State v. Culkin, 97 Hawaiʻi 206, 215, 35 P.3d 233, 242 (2001).

The first prong is subjective; it requires a determination of whether the defendant had the requisite belief that deadly force was necessary to avert death, serious bodily injury, kidnapping, rape, or forcible sodomy. ***The factfinder is required to place itself in the shoes of the defendant, determine the point of view which the defendant had at the time of the incident, and "view the conduct of the [victim] with all its pertinent sidelights as the [defendant] was warranted in viewing it." State v. Janes, 121 Wash.2d 220, 238, 850 P.2d 495, 504 (1993) (quoting State v. Tribett, 74 Wash. 125, 130, 132 P. 875 (1913)). Evaluating the evidence from a subjective point of view ensures that the factfinder "fully understands the totality of the defendant's actions from the defendant's own perspective." Id. at 239, 850 P.2d at 505.***

If the State does not prove beyond a reasonable doubt that the defendant did not have the requisite belief that deadly force was necessary, the factfinder must then proceed to the second prong of the test. *People v. Goetz*, 68 N.Y.2d 96, 114, 506 N.Y.S.2d 18, 29, 497 N.E.2d 41, 52 (1986). This prong is objective; it requires a determination of whether a reasonably prudent person in the same situation as the defendant would have believed that deadly force was necessary for self-protection. . . .

77 Hawaiʻi at 433, 886 P.2d at 770 (bold emphases added) (some italic font in original). In <u>State v. Augustin</u>, 101 Hawaiʻi 127, 128, 63 P.3d 1097, 1098 (2002), the Hawaiʻi Supreme Court provided a similar detailed explanation of how to apply the subjective prong as follows:

. . . <u>Moreover, a defendant may only be charged with "knowledge" of those "circumstances" of which he or she is actually "aware</u>." *See* HRS § 702-206(2)(b) (1993) ("A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist."). That is why,

[u]nder Hawaiʻi law, the standard for judging the reasonableness of a defendant's belief for the need to use deadly force is determined from the point of view of a reasonable person in the [d]efendant's position *under the circumstances as he believed them to be.* The jury, therefore, must consider the circumstances as the [d]efendant subjectively believed them to be at the time he tried to defend himself.

*State v. Pemberton*, 71 Haw. 466, 477, 796 P.2d 80, 85 (1990) (emphasis in original) (citation omitted). <u>It is therefore error to judge the reasonableness of a defendant's viewpoint based on circumstances "shown in the evidence" but of which the defendant is not "aware</u>." *Id*. at 477-78, 796 P.2d at 85. The fact remains, however, that the defendant's belief regarding the immediate necessity of the use of protective force must be reasonable. *See* HRS § 703-300.

(Emphases added) (some italic font in original).

9

Here, the Family Court recited the subjective prong, but did not apply the subjective portion of the analysis.  <u>See</u> FOF 41.  Both the Family Court and the Majority focus on the Court's finding that the "fight was broken up" at the point Minor retrieved the knife.  FOF 23, COL 12.  The Majority thus concludes that Minor "acted in an objectively unreasonable manner by escalating the situation, after the fight was broken up." While the fact that the "fight was broken up" may have been "shown in the evidence" and objectively determined as fact by the Family Court, there was no evidence from Minor's "own perspective" that Minor was actually aware that the "fight was broken up" and he was no longer in danger.  <u>Augustin</u>, 101 Hawai'i at 128, 63 P.3d at 1098; <u>Lubong</u>, 77 Hawai'i at 433, 886 P.2d at 770.  On the contrary, Minor testified that he had been hit twice from the side, from an unknown source, in addition to being struck by CW.[16]  Minor described how he did not have any friends

<hr>

[16]    The transcript reflects the following testimony by Minor:

       Q.    Okay.  What happened when you were <u>on the ground</u>?

       A.    <u>I don't know, was too black.  I got up and</u> then somebody was whack -- like I <u>got whacked from -- on my side</u>.

       Q.    When you say you <u>were whacked from the side, was that by [CW]</u>?

       A.    No, 'cause he on -- <u>he was on the ground</u>, that's why.  I got up and I got -- <u>I got side-blinded</u> (sic) <u>from somebody else</u>.

       Q.    So other than your cousin that was there, did <u>you have any friends that were there</u>?

       A.    <u>No.  It was just Ewa Beach, the whole Ewa Beach</u>.

       Q.    Okay.  <u>Do you know who punched you from the side</u>?

       A.    <u>No</u>.

       Q.    Okay.  <u>And what happened when you were punched from the side</u>?

       A.    <u>I got punch again</u>.  And I was looking.  I was tripping out, like, oh, shit.  <u>Choke people was getting nuts</u>.

(continued...)

there and "[i]t was just Ewa Beach," that there were "a lot of people."  He ran up to the car "[t]o grab the knife" because he "was getting whack[ed]," he was "outnumbered," and he "was scared."  After he grabbed the knife, Minor described CW and a "group of boys coming to rush [Minor]."  Minor explained that he made the "who like get stab" threat to "make them back away, to make them scared," and because "there was . . . so much boys" at that time.  Both the Family Court and the Majority did not consider the "totality of [Minor's] actions from [Minor's] own perspective" under Lubong, 77 Hawaiʻi at 433, 886 P.2d at 770, and instead, rely on a wholly objective determination that the "fight was broken up" to conclude that:  "The confrontation was broken up, but Minor chose to return with the weapon, ultimately stabbing [CW]."  COL 12.  The subjective prong of the reasonableness of Minor's belief of the necessity of deadly force, under the circumstances as Minor believed them to be, was insufficiently and incorrectly applied.  See Augustin, 101 Hawaiʻi at 128, 63 P.3d at 1098; Lubong, 77 Hawaiʻi at 433, 886 P.2d at 770.

    **4.**    **The duty to retreat must be analyzed subjectively, and there was no evidence to support the application of the duty here.**

Under HRS § 703-304(5)(b), the use of deadly force is not justifiable if the actor "knows that he can avoid the necessity of using such force with complete safety by retreating[.]"  (Emphases added).  An actor may only be charged with "'knowledge' of those 'circumstances' of which he or she is actually 'aware.'"  Augustin, 101 Hawaiʻi at 128, 63 P.3d at 1098 (citing HRS § 702-206(2)(b) (1993) ("A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist.")).  With regard to Minor's duty to retreat

---

[16](...continued)
(Emphases added).  "Choke" means a lot; a large amount in quantity, in "pidgin" English.  e-Hawaii - Everything Hawaii, http://e-hawaii.com/pidgin/choke/ (last visited Jan. 25, 2022).

at the point he used deadly force, there are no findings or conclusions that show the Family Court conducted a subjective analysis of "the totality of the [Minor's] actions from [Minor's] own perspective." Lubong, 77 Hawaiʻi at 433, 886 P.2d at 770.

In State v. Mark, the Hawaiʻi Supreme Court examined whether there was evidence under HRS § 703-304(5)(b), that "Petitioner knew he could have retreated with complete safety," where Petitioner Mark was charged with second-degree attempted murder against John Piko (**Piko**) and Denny Paikai (**Paikai**) for shooting toward Piko and shooting Paikai in his leg. 123 Hawaiʻi 205, 210, 225-26, 231 P.3d 478, 483, 498-99 (2010). The Court conducted the subjective prong of the analysis for Mark's use of deadly force by considering Mark's own testimony to conclude that the duty to retreat did not apply, as follows:

> In regard to Paikai, it does not appear that any witness testified directly as to whether Petitioner could have retreated, and thus avoid the necessity of using deadly force with complete safety. Petitioner stated that after Piko had run off, he turned to look for Paikai, and saw him kneeling down at the front of Petitioner's car. Petitioner stated that he "[f]elt like ... [Paikai] might have a weapon or something[,]" and he "was real scared[.]" Petitioner then reached over the car and shot Paikai in the leg in order to "stop him."
>
> Nothing in this testimony indicated that Petitioner knew that he could avoid the necessity of using deadly force by retreating. According to Petitioner, he saw Paikai "kneeling down, and ... coming around [Petitioner's] car towards [Petitioner]." Petitioner thought Paikai might have a weapon, and stated that he shot Paikai to "stop him." The fact that Petitioner felt that he had to "stop" Paikai indicates that Petitioner did not believe that he could have retreated with complete safety. Petitioner did not testify as to any knowledge he may have had in regard to avoiding the necessity of using force. Thus, there was no evidence adduced at trial that, as stated in clause (b), Petitioner knew he could have retreated with complete safety, thereby "avoid[ing] the necessity of using such force[.]" HRS § 703-304(5)(b). . . .

Id. at 225-26, 231 P.3d at 498-99 (emphases added) (brackets in original).

Here, there was similarly no evidence adduced at trial that showed Minor "knew he could have retreated with complete safety, thereby avoiding the necessity of using such force." Id.

12

at 226, 231 P.3d at 499 (brackets and quotation marks omitted). Respectfully, the Family Court's FOF 37 and COL 12, stating that Minor could have "extricated himself from the situation if he stayed in the vehicle or he could have left the area but chose not to do so" (FOF 37), and that "Minor could have waited in the vehicle or left the area with complete safety" (COL 12) -- were not supported by **any** evidence, and in my view, were contradicted by the evidence.

Minor did not testify whether locking himself in the car, or leaving the area was a feasible, safe option.  No other witness gave such testimony.  Minor testified he did not have the keys to his cousin's vehicle, nor did he know where his cousin was at the time of the fight.[17]  There was no evidence that Minor

_____

[17]    The transcript reflects the following testimony by Minor:

>    Q.    And what did you do after [CW] rolled over and you saw that there was blood on you?
>
>    A.    I panicked.  I got up and I was -- I was looking for my cousin so like we can get out of there.
>
>    Q.    Okay.  How did you feel at the time?
>
>    A.    I was scared.
>
>    Q.    Okay.  Scared of what?
>
>    A.    Of his boys going come catch me.
>
>    Q.    Okay.  So did you -- when he rolled to the side, did you attack him at all after that?
>
>    A.    No, I just stood up, and I was running, looking for my cousin.
>
>    Q.    Did you find your cousin?
>
>    A.    Yeah.
>
>    Q.    Where was he?
>
>    A.    Talking -- he was like in this group of friends on the other side.
>
>    Q.    When you say the other side, how far away was that?
>
>    A.    Like five cars away.
>
>    Q.    Okay.  And what did you tell him?
>
>                                             (continued...)

had a drivers' license or knew how to drive.  Minor said he didn't know where his cousin was during the fight and he "didn't have time to bring out [his] phone" during the fight to call his cousin for help.[18]  It is error "to judge the reasonableness of a defendant's viewpoint based on circumstances shown in the evidence but of which the defendant is not aware."  Augustin, 101 Hawaiʻi at 128, 63 P.3d at 1098 (quotation marks and citation omitted).  There was no evidence that reflected that Minor **subjectively** "knew he could have retreated with complete safety, thereby avoiding the necessity of using such force."  Mark, 123

---

[17](...continued)
        A.    I told him, oh, shit, let's get out of here.
Then he said how come?  I said, frick, I accidentally
stabbed somebody.

(Emphases added).

[18]     The transcript reflects the following testimony by Minor:

        Q.    All right.  And -- and then somebody else
punched you in the head, is that what you said?

        A.    Yes.

        Q.    And then you decided to go back to the car
because you were scared?

        A.    Yes.

        Q.    Did you have a phone that night?

        A.    Yes.

        Q.    How were you communicating with your -- your
[Cousin], that you were there with, how were you
communicating with him before you guys got together?  Were
you calling each other or texting each other?

        A.    Yeah, I called him.

        Q.    Called him.  Okay.  All right.  And when all of
this like fighting was going on, was [Cousin] around still
or no?

        A.    He was somewhere around.

        Q.    He was somewhere around.  All right.  And did
you ever try to call [Cousin]?

        A.    No.  I didn't have time to bring out my phone.

(Emphases added).

Hawaiʻi at 226, 231 P.3d at 499 (emphasis added) (quotation marks and brackets omitted) (quoting HRS § 703-304(5)(b)). Accordingly, the Family Court clearly erred in concluding in FOF 37 and COL 12, that Minor was precluded from self-defense because he used deadly force where he had a duty to retreat. See Rodrigues, 145 Hawaiʻi at 494, 454 P.3d at 435.

> **5.  An "assault by multiple attackers" is a special circumstance that must be considered when evaluating deadly force.**

The general rule is that "self-defense using deadly force is not a lawful action to stop a simple assault;" however, an assault by multiple attackers is an "exception to [the] general rule." State v. DeLeon, 143 Hawaiʻi 208, 218, 426 P.3d 432, 442 (2018).[19]  Accordingly, as the evidence reflects that Minor subjectively believed there were multiple attackers because

---

[19]  In DeLeon, defendant Phillip DeLeon was charged, among other things, with second-degree murder of Shawn Powell, and first-degree reckless endangering of Jermaine Beaudoin, during a late-night confrontation outside of a bar between DeLeon and a group of males that included Powell and Beaudoin, which resulted in DeLeon fatally shooting Powell.  143 Hawaiʻi at 209, 426 P.3d at 433.  The issue on appeal involved the exclusion of prior violent acts of Powell and Beaudoin where there was a factual dispute about who was the first aggressor, DeLeon or Powell.  Id. at 218-19, 426 P.3d at 442-43.  The Hawaiʻi Supreme Court explained its adoption of the "multiple attacker" exception to the "general rule" that "self-defense using deadly force is not a lawful action to stop a simple assault," as follows:

> Under the totality of the circumstances, the situation in the instant case falls under the exception to this general rule.  The following testimony, when viewed together, was sufficient to raise a factual dispute as to whether Powell or Beaudoin could be the first aggressor: (1) DeLeon, by himself, faced Powell and his group, which consisted of three to four people, including Beaudoin; (2) someone from that group said, "[t]here's that fucking Mexican"; (3) Powell, and possibly two others from the group, which may have included Beaudoin, continued to approach after DeLeon fired warning shots into the air and ground and told them several times to stay back; (4) as Powell continued to approach, Powell stated, "[w]hat, you think one gun is going to stop us all?" when he was within arm's length of DeLeon.  While DeLeon used deadly force on an unarmed attacker, there is a factual dispute as to whether DeLeon was being attacked by multiple assailants, which is an exception to the general rule that a claim of self-defense fails when deadly force is used to stop a simple assault.

Id. at 218, 426 P.3d at 442 (emphasis added) (brackets in original).

he was struck by others besides CW, even though CW was unarmed, a factfinder could conclude that it would be objectively reasonable for someone in Minor's position to conclude the use of deadly force in self-defense was necessary.  Here, Minor testified that after he grabbed the knife from the car, there were "more boys coming to rush" him, and CW was with this group.  CW testified that there were 30 people there who knew CW  because the gathering was an "Ewa Beach thing."  The eyewitnesses who were all CW's friends described the scene as a "chaotic," "rowdy" party where everyone was drinking, with other people "getting wacked [sic] at the same time" during the fight between Minor and CW; the crowd consisted mostly of Ewa Beach people, but Minor came only with his cousin, from Kalihi.  The Family Court also found that Minor was assaulted by someone besides CW (FOF 36), and Minor testified that he was hit twice by an unknown source. Minor was outnumbered, had already been attacked, and perceived more males about to rush him, even as CW was being physically restrained by his friends.  Thus, the record reflects evidence of Minor's subjective belief that there were multiple potential attackers coming toward him at the time deadly force was used. The Family Court erred in not considering the "assault by multiple attackers" circumstance in evaluating the use of deadly force in this case.  DeLeon, 143 Hawai‘i at 218, 426 P.3d at 442.

In conclusion, for all of the foregoing reasons, viewing the evidence in the strongest light for the prosecution, see State v. Matavale, 115 Hawai‘i 149, 157-58, 166 P.3d 322, 330-31 (2007), there was no substantial evidence to support the conclusion of the Family Court that the justification defense did not apply, and thus, I would reverse the adjudication in this case.

/s/ Karen T. Nakasone
Associate Judge